06-0457
*United States v. Howard*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2006

(Argued: February 26, 2007                          Decided: June 5, 2007)

Docket No. 06-0457-cr

_____

UNITED STATES OF AMERICA,

*Appellant*,

− v. −

JOHN E. HOWARD, III, CHRISTOPHER RESTIFO, DANIEL WILLIAMS,
*Defendants-Appellees*.

_____

Before:      JACOBS, *Chief Judge*, LEVAL and SOTOMAYOR, *Circuit Judges*.

_____

Interlocutory appeal from an order of the United States District Court for the Northern

District of New York (Hurd, J.), suppressing the fruits of two warrantless automobile searches.

We VACATE the suppression order and hold that the district court erred in relying primarily on

the Supreme Court's 1971 decision in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), and in

its suggestion that failure to provide notice of a warrantless automobile search renders the search

unconstitutional.

JAMES E. LONG, Albany, New York, *for defendant-
appellee John E. Howard, III.*

-1-

Kathy Manley, Kindlon Shanks & Associates, Albany, New York, *for defendant-appellee Christopher Restifo.*

DAVID L. GRUENBERG, Troy, New York, *for defendant-appellee Daniel Williams.*

PAUL D. SILVER, Assistant United States Attorney (Glenn T. Suddaby, United States Attorney for the Northern District of New York, *on the brief*), Albany, New York, *for appellant.*

SOTOMAYOR, *Circuit Judge*:

The United States brings interlocutory appeal from the December 30, 2005 order of the United States District Court for the Northern District of New York (Hurd, J.), suppressing the fruits of two warrantless automobile searches. *See United States v. Howard*, 406 F. Supp. 2d 215 (N.D.N.Y. 2005). The district court, relying primarily on the Supreme Court's opinion in *Coolidge v. New Hampshire*, 403 U.S. 443 (1971), held that the drugs and money seized during searches of the defendants' vehicles were obtained in violation of the Fourth Amendment principally because the police employed a ruse to lure the defendants away from their vehicles, and because the police would have had ample time to procure a warrant. The district court further observed that the search was outside the bounds of the Fourth Amendment because the defendants were not timely notified that the searches had occurred.

The government argues that the district court erred in its suppression order by relying primarily on *Coolidge* and by suggesting that the failure to provide notice of a warrantless automobile search renders such a search unconstitutional. For the reasons to be discussed, we agree with the government's arguments and vacate the district court's order.

**BACKGROUND**

The searches at issue were conducted pursuant to an investigation of the conspiracy of which all three defendants in this case are alleged to have been a part. The district court conducted two separate suppression hearings, one for each search challenged by the defendants. Notwithstanding certain factual differences between the searches, the district court noted that they were equivalent for purposes of legal analysis, primarily because in both searches, "[n]o search warrants were obtained, no vehicles were impounded and inventory searched, and no arrests were made." *Howard*, 406 F. Supp. 2d at 222. The district court issued one order suppressing the fruits of both searches. On appeal, the parties generally agree to the facts as related in the district court's opinion. *See id.* at 217-22. We recite here only those aspects of the searches that are important to our resolution of the issues on appeal, drawing primarily from the facts as determined by the district court after the two suppression hearings. Where the parties dispute certain facts as recounted by the district court, we note their discrepant accounts.

I.     *Howard and Restifo Search*

Based on three intercepted telephone calls indicating that defendant John E. Howard, III would be traveling to the Woodbury Commons shopping complex to purchase cocaine, a team of New York State narcotics investigators and agents of the United States Drug Enforcement Agency (the "investigatory team" or the "team") was assigned to surveil Howard on May 20, 2004. Howard left his residence at approximately 10:30 a.m., and the team followed his vehicle. After briefly losing sight of the vehicle, the team observed Howard entering the New York Thruway ("Thruway") at the Schenectady entrance. At that time, he had a passenger with him in the car, who was later determined to be defendant Christopher Restifo.

-3-

Howard and Restifo parked and left Howard's vehicle in the lot at Woodbury Commons, returning to it roughly two and a half hours later. At approximately 4:45 p.m., a sport utility vehicle ("SUV") arrived and parked nose-to-nose with Howard's vehicle. Howard exited his vehicle, entered the SUV, and sat in its passenger seat for three to four minutes. He then returned to his own vehicle to retrieve a black knapsack. He reentered the SUV, this time with the black knapsack in hand, and sat there for a few minutes, at which point he returned to his vehicle and retrieved a small black object, which the district court suggested might have been a cell phone. Reentering the SUV, he sat in it for an additional four minutes and then exited the vehicle carrying the same black bag. He placed the black bag in the trunk of his vehicle and entered his vehicle on the passenger's side while Restifo moved to the driver's seat. The vehicle left the Woodbury Commons parking lot, with Restifo driving and Howard in the passenger seat, and proceeded north on the Thruway, followed by the investigatory team.

Having been informed by members of the investigatory team that an exchange had been made, the team leaders decided to stop and search the vehicle. Because no determination had been reached whether to arrest Howard and Restifo at this point in the investigation, the team leaders devised a ruse to lure Howard and Restifo away from their vehicle so that it could be searched, unbeknownst to them, by law enforcement personnel.

Between 6:00 and 7:00 p.m., approximately one hour north of Woodbury Commons, Howard and Restifo were pulled over by two uniformed New York State troopers, who told them that the police were investigating a complaint of road rage involving a vehicle fitting the description of Howard's vehicle. They asked Howard and Restifo to come with them to the nearby trooper barracks to investigate the complaint. At this point, according to the district

-4-

court, "[t]he vehicle was surreptitiously tampered with so that the vehicle would remain unlocked even if Howard and Restifo attempted to lock it." *Howard*, 406 F. Supp. 2d at 219.

Howard and Restifo accompanied the troopers to the barracks, leaving parked on the side of the Thruway "what they believed was their locked Acura," according to the district court. *Id.* At the barracks, troopers purportedly investigating the road rage incident interviewed the defendants, who continued to cooperate fully. Meanwhile, members of the investigatory team searched Howard's vehicle, including the trunk. They retrieved a black knapsack, inside which they found about one kilogram of cocaine in a sealed package and a black plastic shopping bag that contained about eight ounces of cocaine hydrochloride. They also found a smaller zip-close bag containing $20,100. The team retained all of these items as evidence.

The team leaders directed the personnel conducting the search of the vehicle to make it appear as though the vehicle had been vandalized while it was left unattended on the side of the Thruway. They broke a pool cue found in the back of the car, presumably belonging to the vehicle's occupants, and used it to pry open the glove compartment, damaging the glove compartment and making it appear as if there had been an attempted break-in. Approximately forty minutes after they stopped the vehicle, and after being advised that the site of the vehicle was cleared of investigators, the troopers returned Howard and Restifo to their vehicle.

At no time did the investigatory team try to procure a search warrant. Moreover, the district court stated that the defendants "remained unaware of the actual events involving the [vehicle search] up to the time of the suppression hearing." *Id.* The government disputes this fact, however, and claims that, "[w]hile additional details of the search may have been disclosed for the first time during the suppression hearing, Howard received notice that the search occurred

when he received a copy of the criminal complaint against him on June 9, 2004. Restifo learned no later than August 5, 2004, at which time he was provided with a copy of, and arraigned on, the superseding indictment, that the police were aware he had cocaine in the car with him on June 1, 2004."

## II. *Williams Search*

Members of the same investigatory team intercepted telephone calls revealing that defendant Daniel Williams planned to travel to New York City on June 1, 2004, and to return with cocaine. During the first call, which took place on April 23, 2004, Williams and co-defendant Redmond McKinnon, who is not a party to this appeal, discussed the quality of specified quantities of cocaine. The second call, also between McKinnon and Williams, was intercepted on April 28, 2004. During this call, McKinnon relayed to Williams that the price of a kilogram of cocaine purchased from co-defendant Affis Cruz, who also is not a party to this appeal, would be $25,000. McKinnon indicated that defendant Howard had said that the price of a kilogram of cocaine was $24,800 when purchased from a different supplier. During the call, Williams stated that he was "tinkering in his lab," suggesting that he was changing cocaine into crack cocaine or bagging cocaine for resale. *Howard*, 406 F. Supp. 2d at 220. During the third call, placed on May 31, 2004, Williams told Cruz that he wanted four kilograms of cocaine and that he would be prepared to pick up the drugs the next day, June 1, 2004.

These phone calls, coupled with other background intelligence obtained over the course of a long-term investigation, provided the basis for surveillance of Williams, which was initiated on June 1, 2004, when Williams left his place of work at approximately 6 a.m. in a black GMC Envoy. The investigatory team followed the vehicle and, after briefly losing sight of it, observed

it parked and unattended at an address in Schenectady, New York, known to be the residence of Williams' mother. Seeing only the Envoy parked at the residence, the investigatory team deduced that Williams might have traded his vehicle for the gold Dodge Stratus the team knew to be registered to Williams' mother. This belief was reinforced when Williams' mother was observed driving her son's Envoy.

Based upon three additional telephone calls between Williams and his co-defendants intercepted that day, all of which concerned cocaine transactions, *see id.* at 220-21, the investigatory team surmised that he was traveling to New York City to procure cocaine, and that he would be returning to Schenectady that same evening. Accordingly, the team set up surveillance northbound on the Thruway, which they inferred from the intercepted telephone calls was the route Williams would be taking home from New York City. Investigatory team leaders, this time in consultation with the office of the United States Attorney for the Northern District of New York, again decided to devise a ruse to lure Williams away from his vehicle so that investigators could conduct a search. No attempt was made to secure a warrant.

At approximately 10:40 p.m., a member of the investigatory team observed a man whom she believed to be Williams at a rest area in Plattekill, New York, driving the gold Stratus registered to Williams' mother. At the direction of team supervisors, two uniformed New York State Troopers stopped Williams' vehicle. When asked to identify himself, Williams provided his driver's license. The troopers took Williams to their barracks purportedly for the investigation of alleged criminal activity, this time a drive-off at a gas station involving a vehicle matching the description of the gold Stratus Williams was driving.

While Williams was being questioned at the barracks, members of the investigatory team

searched his vehicle, including its trunk, and found two kilograms of cocaine and $50,000. The investigators seized the cocaine and the currency, neither of which was secreted in the trunk, and then closed the trunk and secured the vehicle. No damage was done to Williams' vehicle, and the troopers returned Williams to it as soon as they were notified the search was completed. Williams was not arrested. Although he does not contest the issue of when he was provided with notice that the search occurred, the government argues that Williams was informed that the police had searched his vehicle and seized cocaine and currency when he received a copy of the complaint against him on June 9, 2004.

III.     *The Suppression Order*

As noted above, the district court issued one order suppressing the fruits of both searches. Relying primarily on the Supreme Court's 1971 decision in *Coolidge v. New Hampshire*, the district court observed that one theory undergirding the automobile exception to the Fourth Amendment's warrant requirement was that obtaining a warrant to search an automobile was often "'not practicable . . . because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.'" *Howard*, 406 F. Supp. 2d at 223 (quoting *Coolidge*, 403 U.S. at 459-60) (emphasis omitted). Under *Coolidge*, the district court stated, a warrantless search of a vehicle stopped on a highway was justified "'where there is probable cause, because the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained.'" *Id.* (quoting *Coolidge*, 403 U.S. at 460).

In applying *Coolidge* to the instant case, the district court "[a]ssum[ed] *arguendo* that there was probable cause to search each vehicle," *id.* at 224, but held that there were insufficient exigencies to justify the application of the automobile exception in these cases. First, the district

court observed that, "the inherent mobility of the vehicles in these circumstances is insufficient to justify a warrantless search." *Id.* at 225. Here, "[n]either of the drivers [n]or the passenger were close enough to the vehicles to obtain a weapon from within them or to destroy the evidence found in the trunk. In fact, all of the individuals were removed from the scenes by uniformed officers and kept at the trooper barracks a number of miles away from their vehicles until alerted . . . that the individuals could be returned to their vehicles." *Id.* Second, the district court expressed the view that a "hallmark justification for the automobile exception is that the occupants of the vehicle are alerted to the search." *Id.* at 225-26. The district court noted that generally when a vehicle is searched pursuant to the automobile exception, "the driver is there to observe the search and may complain if it was unreasonable, whether because probable cause was lacking or for some other reason." *Id.* at 226. Here, however, "Howard, Restifo, and Williams had no opportunity to challenge the search on any grounds because they were unaware that it had even occurred." *Id.* The absence of a neutral magistrate to determine whether there was probable cause, combined with the absence of oversight by the vehicles' owners was, to the district court, constitutionally insupportable even under the automobile exception. Third, and finally, the district court noted that the long time gap between initiation of surveillance of the defendants and the traffic stops "negat[ed] the criticality of the timing and opportunity to obtain a warrant." *Id.*

The government timely filed an interlocutory appeal of the district court's suppression order.

**DISCUSSION**

I. *Standard of Review*

-9-

On appeal from a district court's grant of a motion to suppress, we review factual findings for clear error, viewing those facts in the light most favorable to the government, *see United States v. Casado*, 303 F.3d 440, 443 (2d Cir. 2002), and we "analyze *de novo* the ultimate determination of such legal issues as probable cause," *United States v. Smith*, 9 F.3d 1007, 1011 (2d Cir. 1993). We thus analyze *de novo* the applicability of the Fourth Amendment's automobile exception. *See United States v. Gagnon*, 373 F.3d 230, 235 (2d Cir. 2004).

II.      *Probable Cause to Conduct the Williams Search*

Williams is the only appellee to claim that the police lacked probable cause to search his vehicle. Williams correctly observes that the district court merely "assumed *arguendo* that there was probable cause to search the Williams[] vehicle and the Howard vehicle," and, while he does not dispute the factual account offered by the district court, Williams contends that those facts do not constitute probable cause for the search of his vehicle.

Probable cause exists if a law enforcement official, on the basis of the totality of the circumstances, has "knowledge or reasonably trustworthy information sufficient to warrant a person of reasonable caution in the belief that an offense has been committed by the person to be arrested." *Panetta v. Crowley*, 460 F.3d 388, 395 (2d Cir. 2006).

Williams claims that the phone call intercepted on May 31, 2004 "set forth no basis for believing that Williams would be traveling from Schenectady to New York City and back." He fails to establish why this particular phone call—separate and apart from all the other intercepted phone calls—should alone be the focus of the court's attention in discerning whether there was probable cause for the traffic stop. Taken together, the six intercepted phone calls amount to probable cause. The district court noted three phone conversations between Williams and two

-10-

co-defendants in April and May 2004, all of which related to cocaine. *Howard*, 406 F. Supp. 2d at 220. In the third of these telephone calls, which took place on May 31, 2004, Williams told a co-defendant that he wanted four kilograms of cocaine and that he would be prepared to pick them up the following day, June 1, 2004. Three additional phone calls intercepted on June 1, 2004, indicated that Williams had gone to New York City to procure the cocaine, and that he had bought two kilograms of the drug while there. *Id.* at 220-21. These calls were plainly sufficient to provide the police with probable cause to stop Williams.

Williams' other arguments do not negate the existence of probable cause. His claim that the surveillance was defective because "there was no proof that the officers surveilling Williams had ever seen him before, or could identify him" is unavailing. The government does not dispute that the officer who testified at the suppression hearing concerning the surveillance of Williams had not seen Williams previously. Regardless, Williams produced a driver's license in his own name when he was stopped by state troopers on the highway, allaying any fears of false identification. Likewise, his claim that no officer saw him arrive in or leave New York City is immaterial, as the phone calls indicated that he was in New York City when he procured the drugs and that "it would take him about two and one-half hours to get back to Schenectady." *Id.* at 221. Finally, Williams' assertion that there was no factual basis for the officers' deduction that he was driving his mother's vehicle is simply not borne out by the record. The police observed Williams' mother driving her son's car earlier in the day, after he left work and stopped by her house, and Williams was ultimately pulled over in a car matching the description of his mother's vehicle, and which was registered to his mother. *Id.* at 220.

Given the totality of the circumstances, the government plainly had probable cause to

-11-

believe that Williams was transporting cocaine in his car and therefore to conduct the search of his vehicle.

III.     *The Warrantless Automobile Searches*

Both searches at issue here implicate the automobile exception to the Fourth Amendment. Warrantless searches "are per se unreasonable under the Fourth Amendment—subject only to a few specifically established and well delineated exceptions." *Coolidge*, 403 U.S. at 454-55. Under the automobile exception, "police may conduct a warrantless search of a readily mobile motor vehicle if probable cause exists to believe the vehicle contains contraband or other evidence of a crime." *United States v. Gaskin,* 364 F.3d 438, 456 (2d Cir. 2004) (*citing Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam)). The Supreme Court has justified the automobile exception under two distinct theories: First, the Court has noted that a person's expectation of privacy in a vehicle is less than his or her expectation of privacy in a home, *see Cardwell v. Lewis*, 417 U.S. 583, 590 (1974), and, second, the Court has held that because a vehicle is readily movable, exigent circumstances might require a warrantless search, *see Carroll v. United States*, 267 U.S. 132, 153 (1925).

As discussed above, the district court suppressed the evidence derived from the two warrantless searches at issue for a variety of reasons, which essentially boil down to these three propositions: (1) the vehicles searched were not inherently mobile because they were parked on the side of the Thruway while their drivers were some distance away at a police barracks; (2) there was ample time to procure a warrant because surveillance of the defendants had been ongoing for some time prior to the traffic stops; and (3) there was no notice provided to the drivers that a search had been conducted. Finally, Restifo offers other justifications for

suppression, namely that clandestine or surreptitious searches always require notice and a warrant and cannot involve seizure of goods. For the reasons to be discussed, we disagree with each of these arguments.

*A.      Inherent Mobility*

The government argues that the defendants' physical distance from the vehicles and the government's control of the vehicles as they were being searched does nothing to mitigate the application of the automobile exception, which, contrary to the district court's conclusion, does not turn on the immediate mobility of the automobile. Rather, the government relies on the Supreme Court's statement in *United States v. Ross*, 456 U.S. 798 (1982), that, where there is probable cause to search a vehicle, "a search is not unreasonable if based on facts that would justify the issuance of a warrant, even though a warrant has not been actually obtained." *Id.* at 809. The government notes that the district court relied almost exclusively on the Supreme Court's 1971 decision in *Coolidge*, and contends that *Coolidge* has been significantly eroded by more recent developments in Fourth Amendment law, namely *Ross* and its progeny. The defendants generally counter that the automobile exception is justified by vehicles' mobility, and that their vehicles were not "readily mobile" within the meaning of the relevant caselaw because the defendants had been taken away from their vehicles, had no notice of the search, and could not have moved the vehicles even if they had wanted to do so.

The district court's finding that the defendants' temporary, voluntary presence in the police barracks for questioning pursuant to the ruse meant that the vehicles were not readily mobile, and that searches of them were therefore not within the automobile exception, was in error for two reasons. First, the district court erred in determining that the vehicles were not

-13-

readily mobile within the meaning of the automobile exception simply on the ground that the drivers and passenger were with police officers at their barracks, undergoing questioning concerning the ruse developed by the officers. Whether a vehicle is "readily mobile" within the meaning of the automobile exception has more to do with the inherent mobility of the vehicle than with the potential for the vehicle to be moved from the jurisdiction, thereby precluding a search. *See Chambers v. Maroney*, 399 U.S. 42, 50-51 (1970) (distinguishing a car, which is "readily movable," from a "fixed piece of property"). The district court's reading of "ready mobility" is in error because the district court appeared to regard the actual ability of a driver or passenger to flee immediately in the car, or the likelihood of him or her doing so, as a requirement for the application of the automobile exception.

We rejected such a reading of "ready mobility" in *United States v. Vassiliou*, 820 F.2d 28 (2d Cir. 1987). Vassiliou was a contractor working for the United States on a military base. Following a fight with a subcontractor while on the base, the two were led to the military police station to settle the dispute. The subcontractor alleged that Vassiliou had pulled a gun on him and then hid the gun in the car. Based on this information, the military police conducted a warrantless search of Vassiliou's vehicle and found the gun. Vassiliou sought to suppress the weapon, contending that the automobile exception did not apply "because his car was on a military outpost over which the military police had plenary jurisdiction and therefore was not mobile." *Id.* at 30 (internal quotation marks omitted). He argued that, "[b]ecause entry to and exit from the post were controlled by the military police . . . he could not simply have driven away." *Id.* (internal quotation marks omitted). We rejected Vassiliou's argument and affirmed the district court's denial of Vassiliou's suppression motion because, regardless of the military's

plenary control over the base, "Vassiliou could have left the military police station while a warrant was being obtained and disposed of the gun elsewhere on the base." *Id.* We determined that the facts presented comprised "precisely the sort of exigent circumstances resulting from the automobile's inherent mobility that the Supreme Court has recognized as justifying the automobile exception to the warrant requirement." *Id.*

Like the defendants in the instant case, Vassiliou effectively claimed that he could not have accessed his car because he was in police custody, and that the vehicle was therefore not "readily mobile" as contemplated by the automobile exception cases. And indeed, like Vassiliou's detention by military police on the base, the detention of the defendants in this case prevented them from accessing their vehicles. But just as the automobile exception was applicable in Vassiliou's case, it applies here. Even where there is little practical likelihood that the vehicle will be driven away, the exception applies at least when that possibility exists. In this case, the police could not lawfully have detained the defendants in the police station had they not consented to remain there. Furthermore, the possibility existed that confederates in another car, of whom the police were unaware, might have observed the police intervention and might drive the car away. The district court erred in determining that the relative inaccessibility of the vehicles, occasioned by the defendants' undergoing questioning at the police barracks, was sufficient to bring this search outside the ambit of the automobile exception.

Thus we need not opine broadly on the continuing vitality of *Coolidge*, because our caselaw interpreting it has made clear that the district court's understanding of "ready mobility" was in error. We additionally observe that the district court's reasoning goes too far and would, if adopted, impermissibly graft onto the automobile exception a requirement of some additional

exigency beyond the inherent mobility of an operational vehicle—in this case, the immediate likelihood of the defendants returning to their vehicles and speeding away in them. In *United States v. Ross*, the Supreme Court made clear that a warrantless search would not violate the Fourth Amendment if there was probable cause to search a vehicle, "even though a warrant ha[d] not actually been obtained." *Ross*, 456 U.S. at 809. The Supreme Court has reiterated this rule in subsequent cases, noting in *Pennsylvania v. Labron* that "[i]f a car is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more," 518 U.S. at 940, and in *Maryland v. Dyson* that no special exigency is required beyond a showing of the mobility of the automobile. *Maryland v. Dyson*, 527 U.S. 465, 467 (1999) (per curiam). Thus, the district court's inquiry into the existence of an additional exigency in this case—that is, the proximity of the drivers and passenger to the vehicles—is misplaced. The mere inherent mobility of the vehicle is sufficient to constitute the "ready mobility" the automobile exception cognizes.

Second, the district court ignored the fact that the automobile exception has been justified by the Supreme Court not only because of automobiles' ready mobility, but also because of the diminished expectation of privacy drivers and passengers enjoy while traveling in them. As the Supreme Court observed in *California v. Carney*, 471 U.S. 386 (1985), "[e]ven in cases where an automobile was not immediately mobile, the lesser expectation of privacy resulting from its use as a readily mobile vehicle justified application of the vehicular exception." *Id.* at 391. Thus even if the vehicles searched in the case at bar were not "readily mobile" within the meaning of the automobile exception, a warrantless search of them would be justified based on the diminished expectation of privacy enjoyed by the drivers and passenger while traveling on the

-16-

Thruway.

B.      *Time to Procure a Warrant*

The district court made much of the fact that a substantial amount of time had passed between the intercepted phone calls, the initiation of surveillance of the defendants and the vehicle searches.  With respect to Howard,[1] the district court noted that investigators knew of his involvement in the drug trafficking conspiracy by April 26, 2004, because of phone calls they had intercepted.  The investigators were aware of Howard's participation in the particular drug transaction at issue at least as early as May 19, 2004, at 1:50 p.m., when an intercepted call indicated that Howard was planning a drug deal.  There were three more intercepted calls over the next twenty hours, and surveillance began the following day, continuing until the traffic stop at approximately 6:00 or 7:00 p.m.  The alleged narcotics transaction took place some time shortly after 4:45 p.m., meaning that one to two more hours transpired between observation of the alleged narcotics transaction and the traffic stop.  Based on this passage of time, the district court found that there was "no way that it could be said that insufficient time had elapsed in which to present the facts to a neutral magistrate and obtain a search warrant." *Howard*, 406 F. Supp. 2d at 224.

The district court made a similar finding with respect to Williams, who was implicated in the drug conspiracy as early as April 23, 2004.  With regard to the particular transaction giving rise to the traffic stop, Williams was being surveilled beginning 4:30 a.m. on the morning of June 1, 2004, and, by about 6:30 a.m., inspectors deduced that he was driving his mother's car to

---

[1]      The district court did not make particularized findings concerning the timing of police surveillance of Restifo.

procure cocaine in New York City. An intercepted call indicated that Williams was leaving New York City at approximately 9:30 p.m. to return to Schnectady. As the district court noted, "[a]t this point, about 16 hours had elapsed since the surveillance started. At least several hours elapsed between when it was deduced that Williams was in the process of purchasing cocaine in New York City and probably was driving a gold Stratus, and when his vehicle was stopped." *Id.* at 225. There was yet another hour between the positive identification of Williams in his mother's gold Stratus and the traffic stop. Once Williams accompanied the police to the barracks, he "was under the complete control of the officers while his vehicle was fully secured by the investigatory team on the Thruway." *Id.* The district court further noted that during the time the ruse was being developed, the investigatory team had sufficient time to contact the United States Attorney's office to discuss its plan, implicitly suggesting that it believed the team could have procured a warrant if it had tried to do so.

The passage of so much time suggested to the district court that a warrant could have been procured to search the vehicles, and that the failure to procure one rendered the search constitutionally defective. However, as noted, the Supreme Court has made clear that an automobile "search is not unreasonable if based upon facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained.*" *Dyson*, 527 U.S. at 467 (quoting *Ross*, 456 U.S. at 809). As discussed above, there was ample probable cause to support these searches, and a disinterested magistrate judge assuredly would have issued a warrant had one been sought. But within the context of the automobile exception, a reasonable search does not become unreasonable because law enforcement officials lacked a warrant. The district court erred in holding to the contrary.

-18-

*C.    Notice*

The district court stated that "[a] hallmark justification for the automobile exception is that the occupants of the vehicle are alerted to the search." *Howard*, 406 F. Supp. 2d at 225-26. In its view, in the absence of a determination by a neutral magistrate that there was probable cause to issue a warrant, this notice requirement serves to provide "[o]versight of law enforcement activities to protect the populace from unreasonable searches and seizures. . . . [W]hen the automobile is stopped, the driver is there to observe the search and may complain if it was unreasonable, whether because probable cause was lacking or for some other reason." *Id.* at 226. The government contends that there is no such requirement in the caselaw.

The district court's conclusory statement on this point is unavailing. In asserting that notice is a "hallmark justification" for the automobile exception, the district court relied solely on a citation to *Coolidge*, which, on our reading, offers no support for its position. Presumably, the district court's citation to *Coolidge* meant to draw the reader's attention to the Supreme Court's statement that "exigent circumstances justify the warrantless search of an automobile stopped on the highway, where there is probable cause, because the car is movable, the occupants are alerted, and the car's contents may never be found again if a warrant must be obtained." *Coolidge*, 403 U.S. at 460 (quoting *Chambers*, 399 U.S. at 51) (internal quotation marks omitted). But this statement merely describes a particular set of exigent circumstances in which the warrantless search in *Chambers* was performed under the Fourth Amendment's automobile exception. The occupants' lack of awareness that a search has been conducted does not necessitate either that a warrant be procured, or that the occupants be notified a search has taken place. Whatever this passage from *Coolidge* means, it certainly does not impose a constitutional notice requirement.

-19-

We thus agree with the government that the district court erred in holding that there was any notice requirement imposed by the Fourth Amendment on warrantless searches conducted pursuant to the automobile exception.

D.      *Surreptitious Searches, Warrants and Notice*

Restifo makes three additional arguments, which focus on the fact that the search of the vehicle in which he was traveling was not merely warrantless, but also surreptitious.  He argues that (1) surreptitious searches always require a warrant; (2) the instant searches were "even more egregious" than conventional surreptitious searches because they involved the seizure of tangible property; and (3) surreptitious searches always involve notice requirements.

In support of his first proposition, Restifo notes that "[s]urreptitious searches . . . have *always required a warrant* because the nature of such searches clearly requires the protection afforded by an independent arbiter."  But as the government notes, none of the cases he cites implicates the automobile exception or any other exceptions where the absence of a warrant is excused.  All of the cases he cites perforce require a warrant because *all* searches require a warrant unless they are made pursuant to a small set of narrow exceptions, of which the automobile exception is one.  *See Coolidge*, 403 U.S. at 454-55.  The correlation between surreptitious searches and the presence of a warrant need not be converted into a requirement that surreptitious searches be conducted only pursuant to a warrant.

Restifo's second argument fails because of the nature of the property seized.  Under normal circumstances the seizure of tangible property might make a search "more egregious" than a search that only results in the seizure of intangibles, as in the photographs of a person's property in *United States v. Villegas*, 899 F.2d 1324, 1337 (2d Cir. 1990).  But the tangibles

-20-

seized here were contraband—drugs and large amounts of cash derived from the drug trade. We would be hard-pressed to recognize some sort of enhanced privacy interest in this contraband, and the police were well within their discretion to remove these items from the stream of public commerce. Moreover, even if the seizure of Restifo's drugs and money were indeed "more egregious" than the seizure of intangible goods, this fact would do nothing to detract from the constitutionality of a search based on probable cause and conducted pursuant to the requirements of the Fourth Amendment, and upon which the Constitution imposes no notice requirement.

Finally, with respect to notice, the numerous cases that Restifo cites uniformly discuss an inapposite set of facts: sneak-and-peek searches in which a warrant has been granted by the court and therefore, in compliance with the demands of Federal Rule of Criminal Procedure 41 and not the Constitution, notice of those surreptitious searches must be given at some time. *See United States v. Pangburn*, 983 F.2d 449, 453-55 (2d Cir. 1993). This requirement is not relevant where the existence of a warrant is excused on other grounds, namely pursuant to the automobile exception.[2]

### E. *Property Damage*

As a final matter, we observe that, in the search of Howard's vehicle, the team damaged the car and Howard's pool cue to create the impression that a thief used the cue to pry open the glove compartment (the policy, presumably, having used undetectable methods). We express no opinion as to whether the damage done was excessive or unnecessary, and we underscore our

---

[2]    In its reply brief, the government makes the blanket argument that even if there had been a Fourth Amendment violation in the conduct of the searches, suppression would be an inappropriate remedy under *Hudson v. Michigan*, 126 S.Ct. 2159, 2164 (2006). We need not address this argument because we find no constitutional violation in the conduct of the warrantless vehicle searches.

view that the damage, excessive or otherwise, did nothing to detract from the reasonableness of the searches. But police should be mindful that "[e]xcessive or unnecessary destruction of property in the course of a search may violate the Fourth Amendment, even though the entry itself is lawful and the fruits of the search are not subject to suppression." *United States v. Ramirez*, 523 U.S. 65, 71 (1998).

## CONCLUSION

For the foregoing reasons, we vacate the order of the district court suppressing the fruits of the two warrantless vehicle searches.