09-1144-cr
United States v. Navas

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

_____

August Term, 2009

(Argued: January 27, 2010          Decided: March 8, 2010)

Docket No. 09-1144-cr

_____

UNITED STATES OF AMERICA,

*Appellant*,

- v.-

JOSE NAVAS, JOSE ALVAREZ, and ARTURO MOREL,

*Defendants-Appellees*,

FAUSTO VELEZ, FERNANDO DELGADO, PEDRO VENTURA, ANTONIO MOREL, and EURIS VELEZ,

*Defendants*.[*]

_____

_____

[*] The Clerk of the Court is respectfully directed to amend the official caption of this action to conform to the caption listed above.

Before:

LEVAL and WESLEY, *Circuit Judges*, and GLEESON, *District Judge*.[**]

Interlocutory appeal from a March 19, 2009 order of the United States District Court for the Southern District of New York (Pauley, J.), which granted in part and denied in part motions to suppress evidence and post-arrest statements collected during the course of a narcotics investigation. The government seeks review of the portion of the district court's order that suppressed narcotics seized by law enforcement officers during a warrantless search of a trailer. We hold that the search was lawful under the "automobile exception" to the Fourth Amendment's warrant requirement.

REVERSED and REMANDED.

_____

TELEMACHUS P. KASULIS, Assistant United States Attorney (Katherine Polk Failla, Assistant United States Attorney, *on the brief*), *for* Preet Bharara, United States Attorney for the Southern District of New York, New York, New York, *for Appellant*.

PATRICK J. JOYCE, New York, New York, *for Appellee Jose Navas*.

LAWRENCE D. GERZOG, New York, New York, *for Appellee Jose Alvarez*.

SUSAN G. KELLMAN, Brooklyn, New York, *for Appellee Arturo Morel*.

_____

[**] The Honorable John Gleeson, United States District Court for the Eastern District of New York, sitting by designation.

WESLEY, *Circuit Judge*:

This appeal concerns a trailer, unhitched from its cab and parked in a warehouse. The district court held that a warrantless search of the trailer ran afoul of the Fourth Amendment. On appeal, defendants liken the trailer to a fixed structure, and argue that the district court properly suppressed the fruits of the search. The government argues that, whether or not attached to a cab, the trailer is subject to a warrantless search pursuant to the "automobile exception" to the Fourth Amendment's warrant requirement. As the trailer was readily mobile and commanded only a diminished expectation of privacy, we hold that the automobile exception applies. Therefore, we reverse.

## I. BACKGROUND

### A. Facts

The information leading to defendants' arrests was provided to the Drug Enforcement Administration ("DEA") by a cooperating witness who himself had been arrested for a narcotics-related offense. The witness informed the DEA that he was a member of a narcotics distribution enterprise that shuttled large quantities of narcotics and illicit proceeds between California and New York City. The *modus*

3

*operandi* of the group, according to the cooperating witness, was to transport the contraband in hidden "traps" located within trailers that contained more mundane freight.[1]  In addition to providing information about the nature of the narcotics trafficking scheme, the cooperating witness also implicated defendant-appellee Jose Navas and provided the number of a cellular telephone that was subsequently linked to Navas following further investigation.

On October 27 2008, the government obtained an order from a magistrate judge in the Southern District of New York

---

[1]  At the suppression hearing conducted by the district court, one of the agents who participated in the challenged search testified that he was "not really a truck guy." Perhaps as a result, there is a dearth of evidence in the record regarding the nature of the vehicle at issue and some confusion in the district court's terminology.  The district court used the word "cab" to describe what we understand to be "[t]he noncargo carrying power unit that operates in combination with a semitrailer or trailer."  23 C.F.R. § 658.5 (Department of Transportation regulation defining the terms "tractor" and "truck tractor").  In some parts of its decision, the court used the term "tractor trailer" to describe what we understand to be a "nonautomotive highway . . . vehicle designed to be hauled" by a "cab." *Webster's Third New International Dictionary of the English Language* 2424 (2002).  At other times, the court referred to the object of the search simply as a "trailer."  The testimony from the hearing suggests that it was in fact only the trailer portion of a tractor trailer.  Thus, for purposes of clarity, we adopt the district court's use of the term "cab" and refer to the vehicle searched as a "trailer."  We only use the phrase "tractor trailer" to denote times at which the cab and the trailer were connected.

4

that authorized law enforcement officers to track the location of the phone.[2]  On November 4, 2008, agents assigned to the Drug Enforcement Task Force observed that the phone was approaching the Bronx.  Based on that observation, agents were dispatched to the Hunts Point Terminal Market to conduct surveillance.[3]  During the afternoon, one of the agents identified Navas at the Market. He was seen unloading a tractor trailer with out-of-state license plates, aided by an individual later identified as defendant-appellee Jose Alvarez.  Later that night, Navas

[2]  The order was issued pursuant to 18 U.S.C. §§ 3121-26, 2703(d), which were enacted in Titles II and III of the Electronic Communications Privacy Act of 1986, Pub. L. No. 99-508, 100 Stat. 1848 (1986).  *See United States v. Navas*, 640 F. Supp. 2d 256, 262 (S.D.N.Y. 2009).  The surveillance authorized by the order allowed the agents to approximate the phone's geographic position by monitoring the "cell site" information transmitted between the phone and the antenna towers in its vicinity.  *See In re Application of the U.S. for an Order for Prospective Cell Site Location Info. on a Certain Cellular Telephone*, 460 F. Supp. 2d 448, 450-52 (S.D.N.Y. 2006) (describing the mechanics and investigative uses of cell site information).  The district court denied defendants' motions to suppress evidence collected pursuant to this order, and those holdings are not at issue in this appeal.  *See Navas*, 640 F. Supp. 2d. at 262-63.

[3]  The Hunts Point Terminal Market is located on Halleck and Spofford Streets in the Bronx.  It is one of the largest wholesale produce and meat processing centers in the world. *See United States v. Alfisi*, 308 F.3d 144, 147 (2d Cir. 2002).  Products are shipped there via air, rail, and road.

5

and Alvarez drove the tractor trailer to a private warehouse on Drake Street in the Bronx, approximately one half mile from the Hunts Point Market.  At the warehouse, the agents watched Navas open the garage door, park the tractor trailer in the warehouse, unhitch the cab, and lower the legs in the front of the trailer to stabilize it.  Navas and Alvarez then drove the cab out of the warehouse, closed its garage door, and drove away.  Some of the surveilling agents pursued Navas and Alvarez, and others remained at the warehouse.

Navas and Alvarez proceeded to a nearby McDonald's restaurant, where they parked the cab on the street.  A male later identified as defendant Fernando Delgado approached the cab and engaged in a discussion with Navas and Alvarez.  After the conversation, Delgado entered a black Lincoln Town Car with Ohio license plates, which then parked in the McDonald's parking lot.  Delgado exited that vehicle, spoke again with Navas and Alvarez, and then entered a silver Honda Odyssey parked adjacent to the Lincoln.  Thereafter, approximately five individuals exited the Honda with black duffel bags.

The agents at the scene then arrested Navas, Alvarez, Delgado, and the remaining occupants of the Lincoln and the

Honda.  Searches incident to those arrests revealed that the duffel bags removed from the Honda were empty, but that additional bags within that vehicle contained gloves, drills, and drill bits.  The agents patted down the arrestees and transported them back to the warehouse, where they were issued *Miranda* warnings in Spanish and patted down a second time.  After receiving *Miranda* warnings, Navas "admitted that he was a driver for drug traffickers, that the trailer was being delivered to a member of the trafficking organization, and that narcotics were stowed in a secret rooftop compartment of the trailer."  *Navas*, 640 F. Supp. 2d at 261.

During the pat-down of an arrestee later identified as defendant-appellee Arturo Morel, an agent noticed a "large box-like object" in Morel's right front pants pocket.  The agent testified at the suppression hearing that Morel stated that the object was "the garage door opener to [his] house," but the garage door of the warehouse opened when the agent "inadvertently" "touch[ed]" it.[4]  *Id.* at 261.  After further discussion, Morel verbally consented to a search "inside

_____

[4]  The district court specifically credited this aspect of the agent's testimony, and its credibility determination is unchallenged.  *See Navas*, 640 F. Supp. 2d at 261 & n.2.

[the warehouse at] 528 Drake Street and anything that was in there." *Id.* Morel also executed a written Consent Form, but neither the agents nor Morel completed the portion of the form calling for a description of the area to be searched.

Following Morel's consent, the agents entered the warehouse and conducted the search at issue in this appeal. Acting on information from Navas's post-arrest statement and the cooperating witness, they examined the top of the trailer and observed physical indicia of a secret compartment. The agents then "ripped off the sheet metal roof" of the trailer, discovered 230 kilograms of cocaine, and promptly seized the contraband. *Id.* at 262.

**B. Procedural History**

Following the November 4, 2008 arrests, eight defendants were indicted on November 19, 2008. The indictment charges a single count of conspiracy to possess and distribute more than five kilograms of cocaine, in violation of 21 U.S.C. § 846. In early 2009, defendants-appelees Navas, Alvarez, and Morel filed separate motions to suppress. The central issues raised by their motions related to the government's cell site surveillance, the

8

searches incident to the arrests, and the search of the trailer.  The district court conducted a suppression hearing on February 24, 2009, at which the government offered testimony from three of the agents who participated in the investigation.  Navas and Alvarez also submitted evidence in affidavit form.

On March 19, 2009, the district court issued a decision granting in part and denying in part the motions.  The district court rejected the challenges to the cell site surveillance.  *See Navas*, 640 F. Supp. 2d at 263-64.  It also held that defendants' arrests were supported by probable cause, and that the searches of their persons, the Honda, the Lincoln, and the cab were all lawful searches incident to those arrests.  *See id.* at 265-66.

Finally, the district court held that the search of the trailer in the warehouse violated the Fourth Amendment.  It began by rejecting the government's argument that Morel's consent was sufficient to permit the search.  The district court found it "undisputed that Morel verbally consented to a general search of the warehouse," but concluded that his consent did not extend to a physically invasive search of

9

the trailer.  *Id.* at 267.[5]  Therefore, the court held, the warrantless search of the trailer was not justified by the consent doctrine.  *Id.*

Turning to the application of the automobile exception, the district court took the view that the doctrine "generally relates to some type of vehicle that is capable of moving on its own."  *Id.* at 267.  Framed as such, the court held that the exception was inapplicable because "[a] stationary trailer, detached from a tractor cab with its legs dropped, and stored inside a warehouse, is not a vehicle that is readily mobile or in use for transportation."  *Id.*  Based on its holdings that Morel's consent did not extend to a search of the trailer and that the automobile exception was inapplicable, the district court ordered that the narcotics evidence be suppressed. *Id.* at 268.

## II. DISCUSSION

We review *de novo* the district court's legal conclusion

---

[5]  In addition to defendants-appellees' arguments relating to the automobile exception, Alvarez separately argues that we may affirm the district court based on the alternative ground that "the search of the warehouse was performed . . . without consent."  Because this assertion ignores the district court's ruling that Morel consented to a general search of the warehouse, we reject it.

10

regarding the constitutionality of the search. *E.g.*, *United States v. Plugh*, 576 F.3d 135, 140 n.5 (2d Cir. 2009). The district court's findings of fact, as well as its probable cause determination, are undisputed. Furthermore, in light of the district court's finding that "Morel verbally consented to a general search of the warehouse," the agents were lawfully within that structure. *Navas*, 640 F. Supp. 2d at 267. To justify the search of the trailer, the government relies exclusively on the automobile exception. Consequently, we are left with a straightforward legal question: Is the warrantless search of a trailer that is unhitched from its cab permissible under the automobile exception to the Fourth Amendment's warrant requirement? We hold that the exception applies.

**A.   The Automobile Exception**

We begin our inquiry on well-tread ground. "[S]earches conducted outside the judicial process, without prior approval by judge or magistrate, are *per se* unreasonable under the Fourth Amendment — subject only to a few specifically established and well-delineated exceptions." *Katz v. United States*, 389 U.S. 347, 357 (1967) (footnote omitted). One such exception is the "automobile exception."

11

It permits law enforcement to conduct a warrantless search of a readily mobile vehicle where there is probable cause to believe that the vehicle contains contraband. *E.g.*, *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam). Where the probable cause upon which the search is based "extends to the entire vehicle," the permissible scope of a search pursuant to this exception includes "'every part of the vehicle and its contents [including all containers and packages] that may conceal the object of the search.'" *United States v. Harwood*, 998 F.2d 91, 96 (2d Cir. 1993) (alteration in original) (quoting *United States v. Ross*, 456 U.S. 798, 825 (1982)); *see also California v. Acevedo*, 500 U.S. 565, 580 (1991).

The Supreme Court has relied on two rationales to explain the reasonableness of a warrantless search pursuant to the automobile exception: vehicles' inherent mobility and citizens' reduced expectations of privacy in their contents. *See, e.g.*, *California v. Carney*, 471 U.S. 386, 391 (1985); *see also United States v. Howard*, 489 F.3d 484, 492 (2d Cir. 2007). One of the seminal cases defining the exception, *Carroll v. United States*, emphasized vehicles' mobility:

[T]he guaranty of freedom from unreasonable searches and seizures by the Fourth Amendment has been construed, practically since the beginning of the government, as recognizing a necessary difference between a search of a store, dwelling house, or other structure in respect of which a proper official warrant readily may be obtained and a search of a ship, motor boat, wagon, or automobile for contraband goods, where it is not practicable to secure a warrant, because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.

267 U.S. 132, 153 (1925); *see also Carney*, 471 U.S. at 390 (characterizing *Carroll* as being based on "a long-recognized distinction between stationary structures and vehicles"). Based on this reasoning, courts have held that vehicular mobility is a sufficient exigency to permit law enforcement to invoke the doctrine. *E.g.*, *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999).

In addition to the mobility rationale, other authority emphasizes that warrantless searches pursuant to the automobile exception are also reasonable because citizens possess a reduced expectation of privacy in their vehicles. *See Carney*, 471 U.S. at 393.

"Automobiles, unlike homes, are subjected to pervasive and continuing governmental regulation and controls, including periodic inspection and licensing requirements. As an everyday occurrence, police stop and examine vehicles when license plates or inspection stickers have

13

> expired, or if other violations, such as exhaust fumes or excessive noise, are noted, or if headlights or other safety equipment are not in proper working order."

*Id.* at 392 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 368 (1976)). Thus, citizens' reasonable expectations of privacy in their vehicles are reduced by the far-reaching web of state and federal regulations that covers not only vehicles but also our nation's roadways. As a result, warrantless searches of readily mobile vehicles, when based on probable cause, are reasonable under the Fourth Amendment.

Although we have characterized the mobility and reduced-privacy rationales as "distinct," they are related. *Howard*, 489 F.3d at 492. A vehicle's mobility has given rise to "a range of . . . regulation[s] inapplicable to a fixed dwelling," which has in turn reduced citizens' reasonable expectations of privacy in their vehicles. *Carney*, 471 U.S. at 393. Consequently, when a vehicle is both inherently mobile and subject to a reduced expectation of privacy — as we conclude is true of the trailer in this case — a warrantless search supported by probable cause is permissible under the automobile exception.

**B. Mobility**

14

The phrase "readily mobile" is frequently used as a term of art to describe the mobility rationale. *See, e.g.,* *Dyson*, 527 U.S. at 467; *Howard*, 489 F.3d at 492-93; *United States v. Gaskin*, 364 F.3d 438, 456 (2d Cir. 2004). As we recently made clear, a vehicle's inherent mobility — not the probability that it might actually be set in motion — is the foundation of the mobility rationale. *See Howard*, 489 F.3d at 493. In our view, this rationale supports the application of the automobile exception to the warrantless search of the trailer.

As we have already indicated, the mobility rationale originates from the Prohibition Era case of *Carroll v. United States*, 267 U.S. 132 (1925). There, the Supreme Court upheld a warrantless search of a car stopped on a highway where the officers had probable cause to believe that the vehicle's occupants, two bootleggers, were transporting "intoxicating spirituous liquor" in violation of the National Prohibition Act. *Id.* at 134. The *Carroll* Court conducted a historical inquiry and found a distinction between the Fourth Amendment's application to a search of a "store, dwelling house, or other structure," for which a warrant was required, and a search of a "movable vessel"

such as a "ship, motor boat, wagon, or automobile," "where it is not practicable to secure a warrant." *Id.* at 151, 153. To explain the distinction, the Court reasoned that a vessel of the latter type could be "quickly moved" and "readily . . . put out of reach of a search warrant." *Id.* at 151, 153.

Under our case law, the mobility rationale articulated in *Carroll* does not turn on case-by-case determinations by agents in the field regarding either the probability that a vehicle could be mobilized or the speed with which movement could be achieved. Rather, "[w]hether a vehicle is 'readily mobile' within the meaning of the automobile exception has more to do with *the inherent mobility of the vehicle* than with the potential for the vehicle to be moved from the jurisdiction, thereby precluding a search." *Howard*, 489 F.3d at 493 (emphasis added).

In *Howard*, we sustained two roadside vehicular searches that were conducted while the vehicles' occupants were being questioned at New York State Troopers' barracks. *Id.* at 492-96. In doing so, we attributed error to the district court's decision "to regard the actual ability of a driver or passenger to flee immediately in the car, or the

16

likelihood of him or her doing so, as a requirement for the application of the automobile exception." *Id.* at 493. We also pointed out that "the district court's inquiry into . . . the proximity of the drivers and passenger to the vehicles . . . [was] misplaced." *Id.* at 494. Instead, "[t]he mere inherent mobility of [a] vehicle is sufficient to constitute the 'ready mobility' the automobile exception cognizes." *Id.*

In light of *Howard*'s emphasis on inherent mobility and the practical concerns that animate the mobility rationale, the district court erred in its assessment of the trailer sans cab. It started by wrongly characterizing the automobile exception as "generally relat[ing] to some type of vehicle that is capable of moving on its own." *Navas*, 640 F. Supp. 2d at 267. However, when the Supreme Court introduced the mobility rationale in *Carroll*, it referenced "wagon[s]," which, like trailers, require an additional source of propulsion before they can be set in motion. *Carroll*, 267 U.S. at 153; *see also Ross*, 456 U.S. at 820 n.26 (referring to "contraband . . . transported in a horse-drawn carriage"). A wagon is not "capable of moving on its own," but the *Carroll* Court considered it to present

17

mobility concerns similar to those presented by the car searched in that case. And, at least for purposes of the Fourth Amendment, a trailer unhitched from a cab is no less inherently mobile than a wagon without a horse.

The district court's adoption of a false premise — *i.e.*, that the automobile exception centers on a vehicle's ability to "mov[e] on its own" — led it to place undue emphasis on the fact that the trailer was disconnected from a cab at the time of the search. However, the trailer remained inherently mobile as a result of its own wheels and the fact that it could have been connected to *any* cab and driven away. For similar reasons, we are unpersuaded by the district court's reference to the position of the trailer's "legs." These legs served only as a temporary stabilization mechanism. They could be retracted and a cab could be attached to the trailer. As such, the fact that the trailer was "detached from a . . . cab with its legs dropped," *Navas*, 640 F. Supp. 2d at 267, did not eliminate its inherent mobility.

Moreover, contrary to defendant Morel's assertion, a trailer "with its legs dropped," *id.*, is quite unlike a motor home with its wheels "elevated on blocks," *Carney*, 471

18

U.S. at 394 n.3. Trailers are routinely parked, legs dropped, with the expectation of promptly returning them to the road as soon as they have been loaded or a cab becomes available to haul them. The dropping of the legs in no way suggests that the trailer will not promptly return to service on the highways. In contrast, the raising of a motor home onto blocks is a more elaborate process, less easily undone, which might "objectively indicate[] that [the motor home] is being used as a residence" rather than a vehicle. *Id.* The position of a trailer's legs conveys no such impression. There is no question that the trailer in this case was being used as a vehicle and not a residence.

Finally, the district court also erred by relying on the location of the defendants and the agents at the time of the search. "Even where there is little practical likelihood that the vehicle will be driven away, the [automobile] exception applies . . . when that possibility exists" because of the vehicle's inherent mobility. *Howard*, 489 F.3d at 493. The district court concluded that this standard was not satisfied, reasoning that it was "hard to imagine a scenario where the [trailer] could have been hooked up to a cab" because "[d]efendants were under arrest,

19

and more than a dozen government agents surrounded the warehouse." *Navas*, 640 F. Supp. 2d at 268. As in *Howard*, the district court appears to have erroneously regarded "the actual ability of a driver or passenger to flee immediately in the [vehicle], or the likelihood of him . . . doing so, as a requirement for the application of the automobile exception." 489 F.3d at 493. Although the arrestees were detained and the warehouse was secured by the agents, these facts had no bearing on the inherent mobility of the trailer itself.

In reasoning otherwise, the district court suggested that, instead of performing the search, the agents were required to halt an ongoing investigation in order to wait at the scene and ensure that the trailer remained secure while a search warrant was obtained. The Fourth Amendment does not necessitate such a course of action. The agents had probable cause to conduct the search, and "an automobile 'search is not unreasonable if based upon facts that would justify the issuance of a warrant, *even though a warrant has not been actually obtained*.'" *Howard*, 489 F.3d at 495 (emphasis in original) (quoting *Dyson*, 527 U.S. at 467). The "justification to conduct such a warrantless search does

20

not vanish once the car has been immobilized." *Michigan v. Thomas*, 458 U.S. 259, 261 (1982).

If the agents had left the area around the warehouse, the inherent mobility of the trailer would provide ample cause for concern that it could be removed from the jurisdiction. For example, as we observed in *Howard*, "confederates in another car, of whom the police were unaware, might have observed the police intervention and might drive the [trailer] away." 489 F.3d at 493-94. The district court referenced this hypothetical, but apparently found it inapposite because the warehouse was "surrounded" by "more than a dozen government agents." *Navas*, 640 F. Supp. 2d at 268. However, the very function of the automobile exception is to ensure that law enforcement officials need not expend resources to secure a readily mobile automobile during the period of time required to obtain a search warrant.

In sum, the trailer in this case was: (1) affixed with at least one axle and a set of wheels; and (2) capable of being attached to a cab and driven away. Therefore, we conclude that the trailer was inherently mobile at the time of the search, notwithstanding the fact that it was

unhitched from the cab that initially transported it to the warehouse. Accordingly, we hold that the mobility rationale militates in favor of the conclusion that the search of the trailer was lawful under the automobile exception.

**C.   Reduced Expectation of Privacy**

The district court also failed to properly consider the reduced-privacy rationale underlying the automobile exception. Although it acknowledged the "'diminished expectation of privacy enjoyed by the drivers and passengers,'" the court discarded this proposition and repeated its mobility-based holding that "the unhitched trailer in the warehouse [did] not constitute a vehicle in use for transportation." *Navas*, 640 F. Supp. 2d at 268 (quoting *Howard*, 489 F.3d at 494). This failure to account for defendants' reduced expectation of privacy in the trailer was also error.

Indeed, the reduced-privacy rationale applies forcefully here. Agents had observed the trailer being used for transportation. Unlike the motor home in *Carney*, the trailer bore no objective indicia of residential use that might give rise to elevated privacy expectations in its contents. Moreover, any expectation of privacy that

22

defendants may have harbored in the trailer was significantly diminished by the "pervasive schemes" of state and federal regulation to which it was subject. *Carney*, 471 U.S. at 392; *cf. New York v. Burger*, 482 U.S. 691, 700 (1987) (reasoning that expectations of privacy are "particularly attenuated in commercial property employed in 'closely regulated' industries"). Several of our sister circuits have held that the interstate commercial trucking industry is pervasively regulated to an extent that justifies a warrantless administrative search of a tractor trailer. *See, e.g.*, *United States v. Delgado*, 545 F.3d 1195, 1201-02 & n.3 (9th Cir. 2008). Although the foundation for the administrative search exception to the warrant requirement is entirely distinct from the rationales underlying the automobile exception, the discussion of the applicable regulatory structures in this authority is instructive. Based on the nature and scope of the regulations relating to the commercial trucking industry, we are persuaded that defendants' reasonable expectations of privacy in the trailer were minimal. Therefore, the reduced-privacy rationale provides further support for our conclusion that the warrantless search of this inherently

mobile trailer was reasonable under the Fourth Amendment.

## III.  CONCLUSION

For the foregoing reasons, we hold that the automobile exception applies because the trailer was inherently mobile, and defendants possessed a significantly reduced expectation of privacy in the trailer.  Accordingly, the district court's order is **REVERSED** insofar as it granted the motion to suppress, and the matter is **REMANDED** for further proceedings consistent with this opinion.