**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

───────────────

**No. 09-4756**

───────────────

UNITED STATES OF AMERICA,

             Plaintiff - Appellee,

     v.

JODY ALTON SMITH, SR.,

             Defendant - Appellant.

───────────────

Appeal from the United States District Court for the Western District of Virginia, at Roanoke.   James C. Turk, Senior District Judge.  (7:07-cr-00079-jct-1)

───────────────

Argued:  September 23, 2011        Decided:  December 1, 2011

───────────────

Before AGEE and WYNN, Circuit Judges, and HAMILTON, Senior Circuit Judge.

───────────────

Affirmed by unpublished per curiam opinion.

───────────────

**ARGUED:** Gilbert Kenneth Davis, GILBERT K. DAVIS & ASSOCIATES, LLC, Fairfax, Virginia, for Appellant.   Thomas Ernest Booth, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.   **ON BRIEF:** Timothy J. Heaphy, United States Attorney, Sharon Burnham, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Roanoke, Virginia; Lanny A. Breuer, Assistant Attorney General, Greg D. Andres, Acting Deputy Assistant Attorney General, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

───────────────

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

Jody Alton Smith, Sr. (Smith) was convicted of numerous charges arising from his illegal liquor operation and his fraudulent receipt of Social Security Administration (SSA) funds. He was sentenced to forty-eight months' imprisonment. On appeal, three issues are presented: (1) whether the district court erred in denying Smith's motion to suppress; (2) whether there is sufficient evidence in the record to support Smith's conviction for the fraudulent receipt of SSA funds; and (3) whether the district court erred in calculating the tax loss for purposes of sentencing. We affirm.

I

In this part of the opinion, we first set forth the legal landscape and facts concerning Smith's illegal liquor operation, followed by the legal landscape and facts concerning his fraudulent receipt of SSA funds. We then set forth the relevant procedural history.

A

1

Any person can engage in the business of producing distilled spirits by obtaining a permit from the Alcohol & Trade Tax & Trade Bureau (TTB). 27 U.S.C. § 203(b). A person in the business of distilling spirits is required to, among other

3

things, register the still or distilling apparatus, 26 U.S.C. § 5179, provide a bond covering the operation of the still or distilling apparatus, id. § 5173, and pay the requisite taxes, id. 5001(a)(1). Failure to register the still, post the appropriate bond, or pay the requisite taxes can result in fines and criminal penalties, id. § 5601.

The federal government imposes a tax on distilled spirits either produced in or imported into the United States. Id. § 5001(a)(1). The tax is $13.50 on each "proof gallon" of distilled spirits produced in or imported into the United States. Id. A proof gallon of distilled spirits is a gallon which contains at least one half of its volume in ethyl alcohol. Id. § 5002(a)(10). The tax attaches as soon as the distilled spirits are produced. Id. § 5001(b). The distiller is responsible for paying the tax, id. § 5005(a), which is payable to the TTB, id. § 5061. The taxes owed must be paid at the time the distilled spirits are removed from the bonded premises, id. §§ 5006(a)(1) & 5007.[1]

2

Smith, with the help of several others, ran an illegal liquor operation on an eight acre piece of property (the Halifax

---

[1] The Commonwealth of Virginia imposes its own tax on distilled spirits. The tax equals 20% of the sales price. Va. Code Ann. § 4.1-234(B).

Property or the Property) in Halifax County, Virginia. The Property had three structures on it: a single-wide trailer; a barn converted into a storage shed; and a building, which housed a still. The Property also had four video surveillance cameras which were used to monitor the Property.

In the summer of 2005, federal and state law enforcement agents began to investigate Smith's operation after receiving information from confidential informants. Eventually, the investigation centered on the Halifax Property. Land records showed that Dale Shrock sold the property to Danny Davis on January 17, 2003 for $20,000.00. Davis put 10% down, and Shrock financed the remainder through a deed of trust and a promissory note. In March 2004, Davis applied for building permits and other services on the land, giving the business address and phone number of a business owned by Smith called Smith's Auto Sales. With the assistance of Patricia Waldron, an employee of Smith's Auto Sales, Davis requested and received a $112.50 refund "for renewal of septic system" from the Halifax County Health Department. (J.A. 460). The refund was sent to the business address of Smith's Auto Sales.

On April 19, 2004, an electrical service account for the Halifax Property was established in the name of Rhonda Hall. The account was transferred to Margaret Smith, Smith's companion, on September 28, 2004. From April 2004 to December

5

2004, electrical use at the Property was "minimal." (J.A. 773). In December 2004, electrical use at the Property almost tripled. Electrical use stayed "consistently high" through May 2006. (J.A. 773). In January 2006, electrical use was more than eight times the use in November 2004.

In March 2005, Margaret Smith purchased the Halifax Property from Davis. According to Margaret Smith's accountant, Cynthia Hudgins, the purchase price was $11,568.00, which was the remaining balance on the promissory note.

In early 2006, law enforcement agents drove by the Halifax Property one evening and heard sounds consistent with liquor production. The law enforcement agents did not enter the Property because they saw video surveillance cameras there. As a result, on March 3, 2006, the agents installed a surveillance video recorder on land next to the Halifax Property to record the persons and vehicles arriving and leaving the Property. From March 3, 2006 to April 18, 2006, the surveillance video recorded Smith and several others arriving and leaving the Halifax Property. On April 18, 2006, the law enforcement agents discovered that their surveillance video recorder was missing.

On May 12, 2006, a search warrant was executed at the Halifax Property. In the building, the law enforcement agents found a partially dismantled still, four 1,200 gallon still pots, approximately 119 empty 100-pound bags of sugar, six full

6

100-pound bags of sugar, some bags of barley, numerous bags of yeast, and other things used in the distillery process, including liquor jugs, jug caps, fueling oil, an oil heater, cooling boxes, proofing barrels, and a sump pump.

On May 18, 2006, a search warrant was executed at Smith's residence. Numerous items consistent with illegal liquor trafficking were found, including liquor jugs, jug caps, hydrometers, a thermometer, and $70,000.00 in United States currency. The law enforcement agents also found a set of keys that fit the locks at the Halifax Property, including the building on the Property. In Smith's wallet, the law enforcement agents found a business card for "CKS Packaging" in Graham, North Carolina, and a handwritten note stating "NEPCO, Northern Plastic Corporation, 1902 New Butler Road, New Castle, Pennsylvania." (J.A. 918). The handwritten note also states "Cap style: 38mm tamper-evident caps." (J.A. 918). The law enforcement agents found a time-lapse video recorder, and they also found camera mounting equipment that had the same serial numbers as the video surveillance cameras found at the Halifax Property.[2] In a trailer located on land owned by Smith that was

---

[2] Greg Thomas, an employee of State Electronics in Collinsville, Virginia sold Smith the time-lapse video recorder, the four video surveillance cameras, and the camera mounting equipment in January 2005. The receipt for the sale indicates (Continued)

adjacent to his residence, the law enforcement agents found large plastic containers similar to the proofing barrels recovered on the Halifax Property.

Also on May 18, 2006, a search warrant was executed at Smith's Auto Sales. During the search, Margaret Smith was interviewed by Bart McEntire, an ATF agent. During the interview, Margaret Smith stated that she agreed to take over Davis' payments on the promissory note because he "wanted to get out from under the loan" he had on the Halifax Property. (J.A. 516). According to Margaret Smith, she rented the property as a hunt club to "Mr. Jones." (J.A. 516). Margaret Smith had "no information on Mr. Jones whatsoever," except that "about every three months," she would meet him and collect $1,200.00 in rent. (J.A. 516). Out of the rent received, Margaret Smith paid the monthly electric bill and the property taxes on the Property.[3]

At trial, the government built its case around the testimony of numerous witnesses, including Smith's codefendant, Jarman Johnson, who testified on behalf of the government. The government's evidence established that, from November 2005 to

_____

these items were sold to the "Rock Creek Hunting Club." (J.A. 595).

[3] According to Waldron, on one occasion, Smith paid the property taxes for the Halifax Property.

April 2006, under a variety of names (including "May's," "May's Deli," and "May's Diner," (J.A. 1395)), Smith purchased in twenty-two transactions a total of 124,100 pounds of sugar for $58,402.00 from William R. Hill & Company in Richmond, Virginia. The evidence further established that, from mid-2005 to April 2006, John Taylor purchased liquor from Smith on approximately ten occasions, buying fifty to sixty cases of liquor each time. Smith initially charged Taylor $80.00 per case, but increased the price to $90.00 to $95.00 per case when gas prices started to rise.

Johnson, who was a driver and still hand for Smith, testified that he purchased sugar from William R. Hill & Company, signing receipts in the name of "James Jones." (J.A. 632). In February 2006, accompanied by Johnson, Smith drove a tractor trailer to CKS Packaging in Haw River, North Carolina and purchased 12,000 liquor jugs.[4]  On April 4, 2006, Smith,

---

[4] According to Debbie Evans, a sales associate with CKS Packaging, the phone order for the liquor jugs was placed by a "Mr. Jones." (J.A. 582). During the phone order, "Crossroads Dairy" was the name of the billing address given by Mr. Jones. (J.A. 581). At the time of pickup, no sales tax identification number was provided to CKS Packaging. Evans allowed the sale to proceed because a fax number for Crossroads Dairy was provided and she received assurances that a sales tax identification number would be sent by fax. Evans never received a sales tax identification number for the sale.

accompanied by Johnson, purchased a sump pump for the still at a Lowe's in Rocky Mount, North Carolina.

At the still, Johnson worked with Smith and others. To make a batch of liquor, Johnson would put eleven 100-pound bags of sugar in each of four still pots, which yielded twenty-five to thirty cases of liquor per pot. Each case consisted of six liquor jugs. Afterwards, Johnson would load the liquor jugs into distribution trucks.

B

1

The SSA issues disability insurance payments to certain qualifying disabled persons. In order to qualify for disability insurance benefits, a person must establish that he suffers from a disability, which is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A). If disability benefits are awarded, the SSA must periodically conduct continuing disability reviews. 20 C.F.R. § 404.1594.

A recipient of disability insurance benefits who returns to work first enters a "trial work period." Id. § 404.1592(a). A trial work period is a period to give the recipient the

10

opportunity to test his ability to work for up to nine months within a consecutive sixty-month period without fear of losing his benefits. Id. The nine-month period need not be consecutive, id., and the trial work performed by the recipient may be legal or illegal, id. § 404.1592(b). For a self-employed worker, work will be considered trial work if the self-employed worker works more than eighty hours a month or his net monthly earnings pass a certain threshold. Id. § 404.1592(b)(2)(ii). However, all recipients of disability insurance benefits must notify the SSA if his condition improves, he returns to work, or he increases the amount of his work. Id. § 404.1588.

2

In 1999, Smith contacted the SSA to apply for disability insurance benefits. Richard Lowery, a claims representative with the SSA, talked to Smith by phone and explained the application process to him. Lowery expressly told Smith that he had to be sufficiently disabled such that he could not work, and that if he returned to work, that would affect the amount of his payments. Thereafter, Lowery sent a disability insurance benefits application form to Smith.

Smith submitted a written application for disability insurance benefits to the SSA based on his claim that he could not work due to his disabilities. Smith's application contained

11

a specific provision that he had to notify the SSA if his condition improved or he returned to work. Smith stated that his disabilities had caused him to surrender his car business to his daughter in 1998. In 2001, the SSA approved Smith's application and awarded him $27,391.75.

In 2003, the SSA sent Smith a form entitled "Report of Continuing Disability" to determine whether Smith remained eligible for disability insurance payments. (J.A. 735). Smith completed and signed the form, and returned it to the SSA. On the form, Smith checked a box indicating that he had not worked. He also stated that he was still disabled due to shoulder, back, and leg problems. Smith explained that he was doing less due to pain and that he did very little walking or moving around.

In September 2003, by letter, the SSA notified Smith that he would receive disability insurance payments in the future. The letter also stated that a recipient of SSA payments had to notify the SSA if his condition improved or he returned to work.

In August 2006, Antonio Watkins, a claims representative with the SSA, received an anonymous report that Smith was self-employed. Watkins sent a letter to Smith and, after receiving no reply, tried to call Smith several times. Finally, Watkins reached Smith by telephone and was informed that Smith was not working and that his back problems had gotten worse. Referring to Watkins' letter, Smith reiterated that he had not worked

12

since he had become disabled. Based on Smith's replies, the SSA continued to send disability insurance payments to Smith.

Watkins testified that, even if Smith had been entitled to collect disability insurance payments while working in a trial work period, Smith was overpaid by more than $10,000.00 because a trial work period is limited to nine months, but Smith worked for more than nine months, and his actual income would have caused a substantial reduction in his disability insurance payments.

C

On March 13, 2008, a federal grand jury sitting in the Western District of Virginia charged Smith and six others in a thirty-two count superseding indictment. Smith was charged in thirty-one of the thirty-two counts. In Count One, Smith was charged with conspiracy to produce untaxed liquor, 18 U.S.C. § 371 (Count One). In Counts Two through Eight, he was charged with interstate travel or communication to promote trafficking in untaxed liquor, id. § 1952(a)(3). In Count Nine, he was charged with possession of an unregistered still, 26 U.S.C. § 5601(a)(1), and, in Count Ten, failure to post bond, id. § 5601(a)(4). In Count Eleven, Smith was charged with unlawful production of distilled spirits, id. § 5601(a)(8), and, in Count Twelve, he was charged with fraudulent receipt of government (SSA) funds, 18 U.S.C. § 641. Smith was charged with conspiracy

13

to commit money laundering in Count Thirteen, id. § 1956(h), and, in Counts Fourteen through Twenty-Eight, he was charged with money laundering, id. § 1956(a)(1)(A)(i). In Count Twenty-Nine, Smith was charged with perjury, id. § 1623, and, in Count Thirty-One, he was charged with obstruction of justice, id. § 1503(a). Count Thirty-Two charged Smith with witness tampering, id. § 1532(c)(2). The indictment also contained a forfeiture allegation.

Prior to trial, Smith pleaded guilty to the obstruction of justice count (Count Thirty-One), and the district court dismissed, on the government's motion, the witness tampering count (Count Thirty-Two). At the conclusion of the trial, Smith was convicted of the remaining counts pending against him. Prior to sentencing, the district court granted Smith's motion for judgment of acquittal on the counts related to money laundering (Counts Thirteen to Twenty-Eight). At sentencing, the district court sentenced Smith to forty-eight months' imprisonment. This timely appeal followed.

II

Smith first argues that the district court erred when it denied his motion to suppress based on violations of the Fourth Amendment. The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and

14

effects, against unreasonable searches and seizures." U.S. Const. amend. IV. "[T]he underlying command of the Fourth Amendment is always that searches and seizures be reasonable." Wilson v. Arkansas, 514 U.S. 927, 931 (1995) (citation and internal quotation marks omitted). In resolving whether a search or seizure violates the Fourth Amendment, we review the district court's factual findings for clear error and its legal conclusions de novo. United States v. Perkins, 363 F.3d 317, 320 (4th Cir. 2004).

The facts concerning Smith's Fourth Amendment argument are not in dispute. On March 1, 2006, Senior Special Agent Jay Calhoun of the Virginia Department of Alcohol and Beverage Control entered a piece of land in Pittsylvania County owned by Smith. He entered the land, which was located approximately fifty miles from the Halifax Property, without a warrant. Upon entry, he saw an unhitched tractor trailer that Agent Calhoun believed belonged to Smith. The tractor trailer was "a good distance from any structure, hundreds of yards from any structure." (J.A. 318). The tractor trailer had a new inspection sticker decal with an expiration date of February 2007. The tractor trailer was locked and closed, but there was an open gap in the rubber stripping at the right-hand corner of the tractor trailer. From outside the tractor trailer, Agent Calhoun pointed a flashlight in the open gap, enabling him to

15

see that there were liquor jugs inside the tractor trailer.  His ability to observe the liquor jugs at that time apparently was impaired because pallets of liquor jugs were flush with the tractor trailer's door, limiting his field of vision.

During the night of March 9, 2006, Agent Calhoun went back to the tractor trailer, again without a warrant.  This time, there were wooden pallets outside the tractor trailer.  Because the door opening was no longer blocked, Agent Calhoun was able to more fully observe the inside of the tractor trailer.  He stuck a two-foot "carpenter's scope" through the crack in the rubber stripping of the tractor trailer and saw some liquor jugs inside, but they appeared to have been restacked since his March 1 visit.  (J.A. 364).

In the district court, Smith raised Fourth Amendment arguments concerning both the March 1 and March 9, 2006 entries onto his land in Pittsylvania County, as well as the March 9 search of the tractor trailer.  The district court rejected these arguments.  Of relevance here, the district court first held that Agent Calhoun's warrantless entries onto Smith's land did not implicate the Fourth Amendment because Smith's land was an "open field."  Second, the district court held that Agent Calhoun's view of the interior of the tractor trailer with a flashlight on March 1 was not a Fourth Amendment search because Agent Calhoun did not physically enter the locked tractor

16

trailer. Third, the district court held that Agent Calhoun's insertion of the carpenter's scope into the tractor trailer on March 9 was a search, but it was justified under the "automobile exception" to the Fourth Amendment's warrant requirement because the tractor trailer was a vehicle and Agent Calhoun had probable cause to believe that it contained evidence of illegal liquor trafficking. Fourth, the district court characterized any impact on Smith's Fourth Amendment rights as a result of Agent Calhoun's actions as de minimis. On this final point, the district court emphasized that the government had begun its video surveillance of the Halifax Property before March 9 and that the evidence seen on March 9 inside the tractor trailer was cumulative to the evidence found at the Property on May 12, 2006.

On appeal, Smith first takes issue with the district court's ruling that the Pittsylvania County land constituted an "open field." In Hester v. United States, 265 U.S. 57 (1924), the Supreme Court held that the Fourth Amendment does not extend to open fields. Id. at 59. The Court's holding in Hester was clarified in Oliver v. United States, 466 U.S. 170 (1984). In Oliver, the Court held that "an individual may not legitimately demand privacy for activities conducted out of doors in fields, except in the area immediately surrounding the home [the curtilage]." Id. at 178. The Court further noted that an open

17

field "need be neither 'open' nor a 'field' as those terms are used in common speech. For example . . . a thickly wooded area nonetheless may be an open field as that term is used in construing the Fourth Amendment." Id. at 180 n.11.

In United States v. Dunn, 480 U.S. 294 (1987), the Supreme Court stated that the critical component of the open fields/curtilage inquiry is "whether the area harbors the intimate activity associated with the sanctity of a man's home and the privacies of life." Id. at 300 (citation and internal quotation marks omitted). The Court in Dunn went on to list four factors that should be considered in this analysis: "the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by." Id. at 301.

Applying these factors, it is clear that the district court did not err when it concluded that the land in Pittsylvania County was an open field. There is no evidence that the land was near the curtilage of a home or that there were any domestic uses for the land. In addition, there is no indication in the record that Smith took meaningful steps to prevent this land from being observed. The land must be characterized as an open field and, therefore, Smith cannot challenge either Agent

18

Calhoun's March 1 or March 9, 2006 entry onto his land in Pittsylvania County.

Smith also argues that Agent Calhoun's shining of the flashlight into the open gap in the rubber stripping of the tractor trailer on March 1, 2006 constituted an illegal search.[5] With regard to this argument, we find no Fourth Amendment violation.

Police officers do not conduct a search under the Fourth Amendment when, stationed in a place where they have a right to be, they observe objects in plain view, or use a flashlight to illuminate the area where the object is located. See id. at 305 ("Here, the officers' use of the beam of a flashlight, directed through the essentially open front of respondent's barn, did not transform their observations into an unreasonable search within the meaning of the Fourth Amendment."); Texas v. Brown, 460 U.S. 730, 739-40 (1983) ("It is likewise beyond dispute that Maples' action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment."). Thus, Agent Calhoun did not search the

---

[5] The government does not contend that Smith had no reasonable expectation of privacy in the tractor trailer. However, we agree with the district court that Smith had such an expectation of privacy in the tractor trailer. Cf. United States v. Wright, 991 F.2d 1182, 1186 (4th Cir. 1993) (holding that defendant had reasonable expectation of privacy in a barn in an open field).

19

tractor trailer when, standing outside of it, he pointed his flashlight in the open gap in the rubber stripping of the tractor trailer, which exposed the liquor jugs inside the tractor trailer.

Smith's challenge to Agent Calhoun's use of the carpenter's scope on March 9, 2006 is equally without merit. Initially, we note that the government concedes that Agent Calhoun's use of the carpenter's scope constituted a warrantless search. See New York v. Class, 475 U.S. 106, 114-15 (1986) (noting that a search of an automobile occurs when a police officer physically enters the automobile).

An established exception to the warrant requirement is the "automobile exception." United States v. Kelly, 592 F.3d 586, 589 (4th Cir.), cert. denied, 130 S. Ct. 3374 (2010). Under this exception, a police officer may search a vehicle without a warrant if "probable cause exists to believe it contains contraband" and the vehicle is "readily mobile." Pennsylvania v. Labron, 518 U.S. 938, 940 (1996). If both conditions are met, the police officer may conduct a warrantless search "that is as thorough as a magistrate could authorize in a warrant." United States v. Ross, 456 U.S. 798, 800 (1982). Furthermore, such a search may cover all areas of the vehicle, including any of its "secret compartments." United States v. Bullock, 94 F.3d 896, 899 (4th Cir. 1996).

20

In California v. Carney, 471 U.S. 386 (1985), the Supreme Court held that the police did not need a warrant in order to enter a motor home parked in a public place where probable cause to search was present. Id. at 393-94. The motor home was capable of functioning as a home; it was stationary; and the shades were drawn, including one across the front window. Id. at 388. Indeed, the Court observed that the motor home "possessed some, if not many of the attributes of a home." Id. at 393. Nevertheless, the Court held that it is "clear that the vehicle falls clearly within the scope" of the automobile exception to the warrant requirement. Id. The Court relied on "two requirements for application of the [automobile] exception." Id. at 394. The first is "the ready mobility of the vehicle," and the second is its "presence . . . in a setting that objectively indicates that the vehicle is being used for transportation." Id. Even though the motor home in Carney was parked and not being used for transportation at the moment, it satisfied the second test presumably because it was not located in a place "regularly used for residential purposes—temporary or otherwise." Id. at 392. The Court held that "the vehicle was so situated that an objective observer would conclude that it was being used not as a residence, but as a vehicle." Id. at 393.

Following Carney, courts have applied that case to travel trailers, see United States v. Ervin, 907 F.2d 1534, 1537 (5th Cir. 1990) (upholding warrantless search of travel trailer under the automobile exception), and tractor trailers, see United States v. Navas, 597 F.3d 492, 498-500 (2d Cir.) (upholding warrantless search of tractor trailer under the automobile exception even though cab was not attached to tractor trailer), cert. denied, 131 S. Ct. 320 (2010).

In Navas, in a thorough opinion, the Second Circuit held that the automobile exception applied to a tractor trailer unhitched from its cab, even when the defendants were already placed under arrest at the time of the search. Id. at 501. The court reiterated that "a vehicle's inherent mobility—not the probability that it might actually be set in motion—is the foundation of the [automobile exception's] mobility rationale." Id. at 498. Thus, "the mobility rationale . . . does not turn on case-by-case determinations by agents in the field regarding either the probability that a vehicle could be mobilized or the speed with which movement could be achieved." Id.

In this case, the automobile exception applies to the tractor trailer on the land in Pittsylvania County. The tractor trailer clearly was inherently mobile, and counsel for Smith conceded at oral argument that the tractor trailer could be moved by simply attaching a cab to the tractor trailer.

22

Moreover, the recent unloading activity at the tractor trailer suggested that it might be moved when all of the liquor jugs were unloaded.  In short, embracing Smith's position here would contravene the sound reasoning of both Carney and Navas.

The remaining question is whether Agent Calhoun had probable cause to conduct the search on March 9, 2006.  Probable cause exists "where the known facts and circumstances are sufficient to warrant a [person] of reasonable prudence in the belief that contraband or evidence of a crime will be found." Ornelas v. United States, 517 U.S. 690, 696 (1996).  Probable cause is a "commonsense conception that deals with the factual and practical considerations of everyday life."  Kelly, 592 F.3d at 592 (citation and internal quotation marks omitted).  In assessing whether probable cause exists, courts must "examine the facts from the standpoint of an objectively reasonable police officer, giving due weight to inferences drawn from those facts by local law enforcement officers."  Id. (citation, internal quotation marks, and ellipsis omitted).

At the time Agent Calhoun inserted the carpenter's scope into the tractor trailer, he had probable cause to believe that evidence of illegal liquor trafficking was in the tractor trailer.  Agent Calhoun knew that liquor jugs are commonly used to transport illegal liquor; he had seen multiple liquor jugs inside the tractor trailer on March 1; he heard evidence of

23

illegal liquor manufacturing at the Halifax Property before March 9; and he believed that individuals had unloaded some liquor jugs from the tractor trailer between March 1 and March 9 because the liquor jugs had been reconfigured inside the tractor trailer, and there were loading pallets outside the tractor trailer on March 9. Such facts would lead a reasonably prudent person to believe that "contraband or evidence of a crime [would] be found." Ornelas, 517 U.S. at 696.

In sum, we hold the district court did not err when it rejected Smith's Fourth Amendment arguments.[6]

### III

Next, Smith challenges the sufficiency of the evidence supporting his conviction for fraudulent receipt of SSA funds under 18 U.S.C. § 641. We review challenges to the sufficiency of the evidence de novo. United States v. Kelly, 510 F.3d 433, 440 (4th Cir. 2007). "A defendant challenging the sufficiency of the evidence to support his conviction bears a heavy burden." United States v. Beidler, 110 F.3d 1064, 1067 (4th Cir. 1997) (citation and internal quotation marks omitted). We will uphold a jury's verdict "if, viewing the evidence in the light most

---

[6] In light of this holding, we need not address the district court's conclusion that any impact on Smith's Fourth Amendment rights as a result of Agent Calhoun's actions was de minimis.

favorable to the government, it is supported by substantial evidence." United States v. Reid, 523 F.3d 310, 317 (4th Cir. 2008). Substantial evidence is present if "a reasonable finder of fact could accept [the evidence] as adequate and sufficient to support a conclusion of a defendant's guilt beyond a reasonable doubt." United States v. Burgos, 94 F.3d 849, 862 (4th Cir. 1996) (en banc). "[W]e do not weigh the evidence or assess the credibility of witnesses, but assume that the jury resolved any discrepancies in favor of the government." Kelly, 510 F.3d at 440.

To be convicted under § 641, the government must prove beyond a reasonable doubt that: (1) the money described in the indictment belonged to the United States or an agency thereof; (2) the defendant stole, fraudulently received, or converted the money to his own use; and (3) the defendant did so knowingly with intent to deprive the government of the money. United States v. McRee, 7 F.3d 976, 980 (11th Cir. 1993). With respect to the intent element, the defendant must know that his taking of property is an unlawful conversion. Morissette v. United States, 342 U.S. 246, 270-71 (1952). "[K]nowing conversion requires more than knowledge that defendant was taking the property into his possession. He must have had knowledge of the facts, though not necessarily the law, that made the taking a conversion." Id.

25

At trial, the government firmly established that Smith violated § 641 because he worked while collecting SSA disability insurance payments based on his fraudulent claim that he could not work because he was disabled. Smith was informed, and therefore knew, that he was supposed to notify the SSA if his condition improved or he returned to work. Not only did Smith fail to notify the SSA that he was working at his illegal liquor business, but he also falsely told Watkins that he was not working. Such evidence is sufficient to support his conviction.[7]

IV

Finally, Smith challenges his sentence. We review a sentence imposed by the district court under the deferential abuse-of-discretion standard, regardless of whether the sentence imposed is inside, just outside, or significantly outside the

---

[7] Smith argues that there is insufficient evidence to prove that he performed trial work beyond the trial work permitted under 20 C.F.R. § 404.1592(a), and, thus, his § 641 conviction cannot stand. We reject this argument because it is premised on a view of the facts that the jury obviously rejected; that is, that Smith only was involved in the illegal liquor operation for a nine-month period. Moreover, Watkins testified that, even if Smith was given the benefit of a trial work period, he still was overpaid more than $10,000.00. Finally, Smith fails to cite any authority, and we could find none, suggesting that a recipient of disability insurance benefits is not required to notify the SSA under 20 C.F.R. § 404.1588 during a trial work period if his condition improves, he returns to work, or he increases the amount of his work.

26

Guidelines range. United States v. Evans, 526 F.3d 155, 161 (4th Cir. 2008); see also Gall v. United States, 552 U.S. 38, 41 (2007). The first step in this review requires us to inspect the record for procedural reasonableness by ensuring that the district court committed no significant procedural errors, such as failing to calculate or improperly calculating the Guidelines range, failing to consider the 18 U.S.C. § 3553(a) factors, or failing to adequately explain the sentence. United States v. Boulware, 604 F.3d 832, 837–38 (4th Cir. 2010). The second step requires us to consider the substantive reasonableness of the sentence imposed, taking into account the totality of the circumstances. Gall, 552 U.S. at 51.

On April 14, 2009, at the government's urging, the district court held a sentencing hearing to determine the tax loss. Such determination was critical because the tax loss would establish Smith's base offense level under § 2T2.1 of the United States Sentencing Guidelines (USSG). Robert Kehoe, an investigator with the TTB, was the only witness who testified at the hearing.

Investigator Kehoe prepared three tax loss estimates: (1) $217,795.50; (2) $320,045.85; and (3) $555,984.00. The tax loss estimates were based in part on the trial evidence, Investigator

27

Kehoe's professional experience, and an "Alcohol Yield Formula" (AYF).[8] (J.A. 1385).

Investigator Kehoe's maximum loss estimate assumed that the still on the Halifax Property functioned at full capacity from November 2004 to May 2006, and relied on Johnson's trial testimony that the still used 4,400 pounds of sugar for each weekly run. Application of the AYF yielded 41,184 proof gallons of distilled spirits and a tax liability of $555,984.00.

Investigator Kehoe's middle loss estimate was based on the conclusion that Smith obtained an "undocumented quantity" of sugar from "other sources" during a "middle period" of the still's operation. (J.A. 1388). Investigator Kehoe reasoned that the significant reductions in Smith's sugar purchases during this middle period, when compared to other evidence that the still was operating in high gear during this same period, only could be explained by concluding that Smith was obtaining sugar from another sources. Investigator Kehoe's application of the AYF to the middle loss estimate yielded 182,362 pounds of sugar, 23,707.10 proof gallons of distilled spirits, and $320,045.85 of tax loss.

---

[8] The AYF is a formula used for determining the alcohol yield of sugar used in illegal liquor operations. The "average yield is 13 proof gallons of alcohol per each 100 pounds of sugar." (J.A. 1385). Smith does not challenge the reasonableness of the AYF.

Investigator Kehoe's minimum loss estimate was based on the documented sugar purchases between November 2004 and May 2006 from William R. Hill & Company. Application of the AYF to the known 124,100 pounds of sugar purchased yielded 16,133 proof gallons of distilled spirits and a tax loss of $217,795.50.

Following the hearing, the district court accepted Investigator Kehoe's minimum tax loss estimate of $217,795.50 because it was based on the sugar purchase records admitted at trial and utilized a reliable methodology to determine the tax loss. The district court also concluded that the AYF was reasonable given the lack of records of the actual distilled spirits produced. The district court rejected Investigator Kehoe's maximum estimate because it was unrealistic to assume that the still was always operating at maximum capacity, and rejected Investigator Kehoe's middle estimate because it was not based on documented sugar purchases.

Consistent with the district court's ruling on the tax loss issue, a Presentence Investigation Report (PSR) was prepared by a United States Probation Officer. Because the tax loss was more than $200,000.00 and no more than $400,000.00, Smith's base offense level was 18, USSG § 2T4.1(G). His base offense level was increased four levels for his leadership role in the offense, id. § 3B1.1(a), and two levels for perjury, id. § 3C1.1. Smith's total offense level of 24, coupled with a

29

Criminal History Category of I, produced a sentencing range of 51 to 63 months' imprisonment.

At sentencing, the district court adopted the PSR's findings and recommendations. Prior to imposing sentence, the district court heard from counsel, as well as from Smith, concerning the appropriate sentence. After considering the advisory sentencing range, as well as the factors set forth in 18 U.S.C. § 3553(a), the district court sentenced Smith to forty-eight months' imprisonment due to his age and physical condition.

Smith's challenge to the district court's tax loss calculation is premised on the argument that it was procedurally unreasonable for the district court to base its calculation on the documented purchases of sugar from William R. Hill & Company. Smith posits that there was no evidence that Smith purchased any sugar from the company. Consequently, the tax loss calculation should have been based on the known liquor purchases made by Taylor—approximately 3,000 gallons of liquor.

USSG § 2T2.1 provides that the tax loss is the amount of taxes that the taxpayer "failed to pay or attempted not to pay." USSG § 2T2.1(a). The base offense level for USSG § 2T2.1 is calculated by reference to the Tax Table in USSG § 2T4.1. USSG § 2T2.1(a). Under the Guidelines, the tax loss is "determined by the same rules applicable in determining any other sentencing

factor." USSG § 2T1.1, comment. (n.1). "In some instances, such as when indirect methods of proof are used, the amount of the tax loss may be uncertain; the guidelines contemplate that the court will simply make a reasonable estimate based on the available facts." Id.; see also id. § 6A1.3(a) (noting that the district court "may consider relevant information without regard to its admissibility under the rules of evidence applicable at trial, provided that the information has sufficient indicia of reliability to support its probable accuracy"). In general, the district court's calculation concerning loss is a factual finding reviewed for clear error. United States v. Loayza, 107 F.3d 257, 265 (4th Cir. 1997).

The district court's finding that the tax loss was $217,795.50 is not clearly erroneous. The district court reasonably relied on the records of sugar purchases and the AYF to determine the amount of untaxed liquor produced by the still because detailed records of Smith's actual production amounts were unavailable. Moreover, the district court was at liberty to reject Smith's contention that the still did not produce illegal liquor prior to November 2005 by crediting the circumstantial evidence demonstrating that Smith actively participated in the conspiracy during the time alleged and went to great lengths to mask his participation in the conspiracy and his relationship to the Halifax Property. The district court

31

took the most conservative view of the evidence in accepting Investigator Kehoe's lowest tax loss estimate, and we cannot take issue with this prudent approach in calculating the tax loss.

V

For the reasons stated herein, the judgment of the district court is affirmed.

AFFIRMED