[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 17-13663

_____

D.C. Docket No. 8:16-cr-00269-SDM-TGW-2

UNITED STATES OF AMERICA,

Plaintiff-Appellee

versus

RAMIRO MANCILLA-IBARRA,

Defendant-Appellant

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 15, 2020)

Before WILLIAM PRYOR and JILL PRYOR, Circuit Judges, and ROBRENO,* District Judge.

_____

* Honorable Eduardo C. Robreno, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

WILLIAM PRYOR, Circuit Judge:

Ramiro Mancilla-Ibarra appeals his conviction and 135-month sentence for conspiring to distribute and possessing with intent to distribute 500 grams or more of methamphetamine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii), 846. He argues the district court erred by ruling that probable cause existed to arrest him when it denied his motion to suppress the evidence seized from his arrest. Mancilla-Ibarra also challenges the denial of a two-level reduction in his offense level. *See* United States Sentencing Guidelines Manual § 2D1.1(b)(17) (Nov. 2016) (incorporating by reference the safety-valve criteria from section 5C1.2(a)). Because the district court did not err in either decision, we affirm.

## I. BACKGROUND

Officers arrested Mancilla-Ibarra during a sting operation by the Drug Enforcement Administration to catch the methamphetamine supplier of dealer-turned-informant Ricky Fann. A confidential informant had confirmed to officers that Fann sold methamphetamine. That informant stated that Fann's source of supply was a man named "Kouranos." He also told officers that he had traveled with Fann to Kouranos's place of business in Georgia where he observed about 30 kilograms of methamphetamine. Officers set up a surveillance camera near Fann's home to monitor him, and the informant later made a controlled buy of

2

methamphetamine from Fann. On May 15, 2016, officers observed a white Kia van with Georgia tags at Fann's house.

Later that day, officers stopped Fann for running a stop sign. Fann eventually admitted to selling methamphetamine and consented to a search of his home. At his home, Fann voluntarily provided officers over $10,000 in drug money. An initial search led to the discovery of pre-packaged, ready-for-distribution methamphetamine in Fann's ceiling. Fann told the officers that they could find more methamphetamine hidden in his wall and showed the officers where in the wall it was hidden. The officers recovered about three kilograms of methamphetamine stored in larger cellophane-wrapped bundles from the wall.

Fann explained that the drugs came from a source in Georgia named "Benny," who delivered drugs to his house in a white van "every four to five days," and Fann admitted that Benny had made a delivery earlier that day. He explained that he communicated with Benny by text message and requested the methamphetamine in "kilo quantities." also identified one of his buyers and later helped officers conduct a successful sting operation against the buyer.

One week after searching Fann's home, officers asked Fann to text "Benny" to place an order. Fann ordered three kilograms to be "within the norm," although at some point he also told officers that he had never bought more than one kilogram at a time from Benny. One minute after Fann texted Benny saying, "I

3

need three my friend," Benny responded, "Ok buddy," and he later provided Fann an estimated time of arrival for the following day. Benny kept Fann updated on his progress by text message the next day, and an agent, impersonating Fann, informed Benny that the gate at Fann's home was open for Benny. Near the time suggested in the text exchange, the white Kia van with Georgia plates approached Fann's home and pulled through the open gate on the side of the house. Officers approached the van and arrested the driver, Mancilla-Ibarra, without a warrant.

Within about five minutes of the arrest, officers brought a drug sniffing dog to approach the van. The dog alerted, and a search of the vehicle uncovered three kilograms of methamphetamine hidden in the rear speaker of the passenger door. Officers also observed a cell phone in the car, and when they called "Benny" from Fann's phone, the cell phone from Mancilla-Ibarra's car rang with Fann's number appearing on the screen. Mancilla-Ibarra admitted, after being advised of his rights, *see Miranda v. Arizona*, 384 U.S. 436 (1966), that he used the white van to deliver three kilograms of methamphetamine to Fann, that he received the methamphetamine from an unidentified source of supply, and that he had previously delivered methamphetamine to Fann's residence.

A grand jury indicted Mancilla-Ibarra on one count of conspiracy to distribute and possess with intent to distribute 500 grams or more of methamphetamine, 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(viii) and 846, and one count

4

of possessing 500 grams or more of methamphetamine with the intent to distribute, *id.* § 841(a)(1), (b)(1)(A)(viii). Mancilla-Ibarra moved to suppress the evidence seized as the fruit of an unlawful arrest. He argued that the officers lacked probable cause to arrest him and attacked Fann's reliability as an informant. The district court ordered an evidentiary hearing and referred the matter to a magistrate judge.

The government offered the testimony of a detective involved in the investigation to support Fann's credibility. The detective testified that Fann consented to a search of his home; provided the officers with his drug money; told the officers where to find additional drugs in his home; identified his supplier as from Georgia, which was consistent with the original informant's account and the surveillance video of the white van with Georgia tags; helped officers set up a successful sting with one of his customers; and provided the phone number for his supplier and requested the supplier provide more methamphetamine. And the detective testified that the white van with Georgia tags driven by Mancilla-Ibarra appeared around the appointed time in response to Fann's request. The government also argued that, even if the information from Fann did not establish probable cause to arrest Mancilla-Ibarra, the drug dog's alert independently created probable cause to search the van.

The magistrate judge recommended that the district court deny Mancilla-Ibarra's motion to suppress because probable cause existed at the time of the arrest.

The magistrate judge made no recommendation on the dog sniff issue. Mancilla-Ibarra objected to the report and recommendation, but the district court overruled the objections, adopted the report and recommendation, and denied the motion. At a bench trial, the district court found Mancilla-Ibarra guilty of both counts of the indictment.

The presentence investigation report stated that officers uncovered three kilograms of methamphetamine at Fann's home and that Mancilla-Ibarra delivered a kilogram of methamphetamine to Fann's home on May 15. The report also stated that Mancilla-Ibarra admitted to delivering methamphetamine to Fann only twice, once on May 15 and once on the day of his arrest. Although the report flagged the possibility of a two-level reduction based on Mancilla-Ibarra's satisfaction of the five safety-valve criteria, U.S.S.G §§ 2D1.1(b)(17), 5C1.2(a), it did not recommend the reduction because the government asserted that Mancilla-Ibarra failed to satisfy the fifth criteria by not being "forthcoming and complete in his statements about the conspiracy." The report calculated Mancilla-Ibarra's total offense level as 36, with a criminal history category of I. His recommended guidelines range was 188 to 235 months of imprisonment, and his statutory maximum sentence was life imprisonment.

At his sentencing hearing, Mancilla-Ibarra objected to the refusal to recommend a two-level reduction because he satisfied all of the safety-valve

criteria, including the truthful disclosure requirement. U.S.S.G §§ 2D1.1(b)(17), 5C1.2(a). He asserted that he had answered all questions, provided details about the persons he knew to be involved in the drug trafficking, and disclosed the identity of a third person's involvement just before the hearing even though the government did not previously ask about this person. The government responded that Mancilla-Ibarra did not fully cooperate because he refused to provide complete information about one of two coconspirators mentioned at his first debriefing and failed to admit to more than two drug deliveries to Fann despite evidence to the contrary.

The government's first argument stems from Mancilla-Ibarra's first post-*Miranda* interview in which he identified two other coconspirators, Lefty and Castillo. The interview was conducted in Spanish with a Spanish-speaking officer translating. Mancilla-Ibarra allegedly told the officers that he did not want to cooperate against one of these persons, although it is unclear from the record which one. But he did provide a phone number for one of these persons whom officers unsuccessfully tried to call. It is unclear which coconspirator's number Mancilla-Ibarra disclosed, although his counsel says it was Lefty's number.

To support its argument that Mancilla-Ibarra withheld information by refusing to cooperate against a coconspirator, the government called an agent with the Drug Enforcement Administration to testify. The agent acknowledged that he

was not present at the first interview, that he did not speak Spanish, that it was possible the alleged misinformation was due to a translation error, and that he had not reviewed any transcripts, videos, or documents of the interview. His knowledge was based solely on what another agent—he could not recall whom—had stated about the interview.

The government also argued that Mancilla-Ibarra was not entitled to a reduction because he lied about the number of drug deliveries he made to Fann by saying he only made deliveries on May 15 and the day of his arrest. The agent testified on this point too, saying that Fann informed officers that Mancilla-Ibarra delivered methamphetamine more than once before Mancilla-Ibarra's arrest. He additionally testified that the white van Mancilla-Ibarra drove was previously tagged as a transport vehicle in the Drug Enforcement Administration's system. The government also contended that Fann's statement, recorded in the presentence investigation report, that Mancilla-Ibarra resupplied him with methamphetamine every four to five days supported a finding that Mancilla-Ibarra made more than these two deliveries. And the government pointed out that officers recovered three kilograms of methamphetamine from Fann's home on May 15 and that Fann stated he never bought more than one kilogram from Mancilla-Ibarra at a time, which suggested that at least two unadmitted deliveries occurred before that date.

After hearing the testimony, the district court expressed confusion and uncertainty about the facts before rejecting the two-level reduction:

> [Mancilla-Ibarra has] debriefed, but he has not provided information with respect to at least one of these two people and there's a plausible basis to—strike plausible. There's a basis to conclude that he made more than the two trips that he's willing to concede.
>
> I'm not sure about the status of the truth or the untruth of that. I think we've gone on as long as we can profitably on this matter, we're now circling around and behind ourselves for the second or third time. I'm sorry I let it go on so long.
>
> I think it's my responsibility—I don't know what to think about the facts. I would say that the—initially the defendant made a prima facia showing that he cooperated, that the United States has created some doubt about that, particularly arising from the matters involving the co-defendant and the quantities of drugs discovered and his statements about the source of those drugs and the defendant's limitations on his cooperation.
>
> You know, I think the evidence is in equipoise and that the defendant has not satisfied the requirements for safety valve. I don't know what to think. It's a muddled factual picture, as a matter of fact. So I am not persuaded that the safety valve should apply.

Nevertheless, the district court varied downward from the guidelines range and sentenced Mancilla-Ibarra to concurrent terms of 135 months of imprisonment on both counts.

## II. STANDARD OF REVIEW

A denial of a motion to suppress presents a mixed question of law and fact. *United States v. Holloway*, 290 F.3d 1331, 1334 (11th Cir. 2002). We review factual findings for clear error, and the application of the law *de novo*. *Id*. "In

9

reviewing the district court's ruling, this Court must construe the facts in the light most favorable to the party prevailing below, which, in this case, is the [g]overnment." *Id*. We review the interpretation and application of the Guidelines *de novo* and factual findings for clear error. *United States v. Barrington*, 648 F.3d 1178, 1194–95 (11th Cir. 2011).

## III. DISCUSSION

We divide our discussion into two parts. First, we explain that probable cause supported Mancilla-Ibarra's arrest. Second, we explain that the district court did not err by refusing to apply the two-level reduction because Mancilla-Ibarra failed to satisfy his burden of proving his truthful disclosure.

### A.  *Probable Cause Supported the Arrest of Mancilla-Ibarra.*

The Fourth Amendment prohibits warrantless arrests absent probable cause. *United States v. Watson*, 423 U.S. 411, 415–17 (1976). "Probable cause to arrest exists when the totality of the facts and circumstances support a reasonable belief that the suspect had committed or was committing a crime." *United States v. Lindsey*, 482 F.3d 1285, 1291 (11th Cir. 2007) (citation and internal quotation marks omitted). "[I]n making a warrantless arrest an officer may rely upon information received through an informant, rather than upon his direct observations, so long as the informant's statement is reasonably corroborated by

10

other matters within the officer's knowledge." *Illinois v. Gates*, 462 U.S. 213, 242 (1983) (citation and internal quotation marks omitted).

Whether a known informant's tip is sufficient to satisfy probable cause depends on the informant's "veracity or reliability and his basis of knowledge." *Id.* at 233 (internal quotation marks omitted). "[A] deficiency in one [of these areas] may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other, or by some other indicia of reliability." *Id.* So we review whether the "totality of the circumstances" created probable cause. *United States v. Gonzalez*, 969 F.2d 999, 1002 (11th Cir. 1992).

The officers had probable cause to arrest Mancilla-Ibarra because Fann's information was veritable, reliable, and corroborated. Fann personally observed the criminal activity and interacted with his supplier, so he had a clear basis to know with whom he dealt and how to order more methamphetamine. *See United States v. Brundidge*, 170 F.3d 1350, 1353 (11th Cir. 1999). Fann's veracity and reliability were supported by his consent to the officers' search of his home, his voluntary turning over of drug proceeds, his voluntary admission that the officers had missed three kilograms of drugs hidden in his walls during the search, and his statement (confirmed by video surveillance) that a white van with Georgia tags delivered his drugs. *See id.* ("An explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed firsthand, entitles [the informant's] tip

11

to greater weight than might otherwise be the case." (citation and internal quotation marks omitted)). Before officers asked Fann to set up his supplier, officers asked Fann to set up a sting with a buyer he identified. Although Mancilla-Ibarra disagrees with describing the sting as a success because no arrest occurred, "success" does not depend on whether the officers chose to make an arrest. The record reflects that officers observed Fann make the sale and then recruited the buyer to cooperate with law enforcement, which is itself a "success." And the success of that sting likewise supports Fann's reliability and truthfulness. *See id.* Moreover, that the response to Fann's text to his supplier stating, "I need three my friend," was immediate and requested no further clarification supports his reliability. And perhaps most significantly, the white van with Georgia tags appeared on schedule following Fann's text message requesting another delivery. *See id.* ("[T]he level of detail meant that the [informant] was unlikely to lie, because . . . [any] lies would likely be discovered in short order and favors falsely curried would dissipate rapidly." (citation and internal quotation marks omitted)).

Fann's information was also consistent with other information known to officers. For example, Fann said his supplier came from Georgia and that this supplier delivered drugs in a white van on May 15. Another confidential informant confirmed that Fann worked with a supplier from Georgia, and officers observed a

12

white van with Georgia tags at Fann's home on May 15. Given the totality of the circumstances, it was reasonable for officers to believe Fann reliable.

Mancilla-Ibarra attempts to undercut Fann's credibility by pointing out Fann's criminal history and identifying a discrepancy between the name provided by the original informant for Fann's supplier and the name provided by Fann. Despite Mancilla-Ibarra's argument to the contrary, "an informant's criminality does not in itself establish unreliability." *United States v. Taylor*, 471 F.3d 832, 840 (7th Cir. 2006). And the name discrepancy is similarly not discrediting on its own, as there are reasonable explanations for the different names. For example, Kouranos could be the name of the ultimate source and Benny the mere go-between.

Finally, Mancilla-Ibarra stresses that it was unreasonable for the police to believe Mancilla-Ibarra was the May 15 driver because, unlike him, the driver of the white van photographed by officers that day had long hair. But the photo of the May 15 driver does not clearly show whether the driver had long hair. And, even if the May 15 driver had long hair, that fact would not discount the substantial evidence recounted above that supported probable cause. Because probable cause existed for the arrest, we affirm the denial of the motion to suppress.

### B. *The District Court Did Not Err in Refusing to Apply a Two-level Reduction for Truthful Disclosure.*

Mancilla-Ibarra appeals the denial of a two-level reduction to his base offense level because he failed to satisfy the safety-valve criteria. The "safety-valve" provision of the Guidelines requires the district court to "impose a sentence in accordance with the applicable guidelines without regard to any statutory minimum" if the defendant satisfies five criteria. U.S.S.G. § 5C1.2(a); *see also* 18 U.S.C. § 3553(f). Similar in analysis but distinct in effect, the Guidelines also provide for a two-level reduction to a defendant's base offense level for certain drug-trafficking offenses "[i]f the defendant meets the criteria set forth in . . . subsection (a) of [section] 5C1.2." U.S.S.G. § 2D1.1(b)(17).

Imprecisely, the parties refer to this two-level reduction as applying the safety valve. Mancilla-Ibarra is not entitled to safety-valve relief because his guidelines range is not below the statutory minimum with or without the two-level reduction under section 2D1.1(b)(17). But the government agrees that if Mancilla-Ibarra had satisfied the safety-valve criteria under section 5C1.2(a), the district court could have "reduced his offense level [by two] before varying downward and imposing [the] sentence." A defendant bears the burden to prove by a preponderance of the evidence that he satisfies all five safety-valve factors. *United States v. Carillo-Ayala*, 713 F.3d 82, 90 (11th Cir. 2013).

14

Only the fifth factor is in dispute here. Commonly referred to as the "tell-all" provision, *see United States v. Johnson*, 375 F.3d 1300, 1302 (11th Cir. 2004) (emphasis omitted) (citation omitted), the fifth factor requires truthful disclosure:

> [N]ot later than the time of the sentencing hearing, the defendant [must] truthfully provide[] to the [g]overnment all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan, but the fact that the defendant has no relevant or useful other information to provide or that the [g]overnment is already aware of the information shall not preclude a determination by the court that the defendant has complied with this requirement.

U.S.S.G. § 5C1.2(a)(5).

"[T]he defendant has an affirmative responsibility to truthfully disclose to the government all information and evidence that he has about the offense and all relevant conduct." *Johnson*, 375 F.3d at 1302 (citation and internal quotation marks omitted). To satisfy this factor, Mancilla-Ibarra needed "to come forward and to supply truthfully to the government all the information that he possesses about his involvement in the offense, including information relating to the involvement of others and to the chain of the narcotics distribution." *United States v. Cruz*, 106 F.3d 1553, 1557 (11th Cir. 1997) (reviewing the withholding of the safety valve where defendant was convicted of conspiracy to possess cocaine with intent to distribute). "It is up to the defendant to persuade the district court that he has 'truthfully provided' the required information and evidence to the government." *United States v. Montanez*, 82 F.3d 520, 523 (1st Cir. 1996) (citation

15

omitted); *see also United States v. Alvarado-Rivera*, 412 F.3d 942, 947 (8th Cir. 2005) (en banc) ("Defendants have the burden to show affirmatively that they have satisfied each requirement for the safety valve, including whether truthful information and evidence have been given to the government."); *United States v. Gambino*, 106 F.3d 1105, 1110 (2d Cir. 1997) ("It follows that the burden should fall on the defendant to *prove* to the court that he has provided the requisite information if he is to receive the benefit of the statute.").

At the sentencing hearing, the government argued that Mancilla-Ibarra failed to provide complete information about one of his coconspirators and that he lied about the number of methamphetamine deliveries he made to Fann. To prove that Mancilla-Ibarra did not provide complete information about a coconspirator, the government offered an agent's secondhand testimony. But the agent's testimony cannot be considered reliable because he had no personal knowledge, *see* Fed. R. Evid. 602, about what occurred at Mancilla-Ibarra's first interview. *See United States v. Bernardine*, 73 F.3d 1078, 1082 n.4 (11th Cir. 1996) (citation and internal quotation marks omitted). Although the government may not always be able to put on the best or most knowledgeable witness, it must at least put on *a knowledgeable* witness. A witness who instead provides an equivocal and uncorroborated account of what he has been told by an unidentified person will not do. To be sure, Mancilla-Ibarra bore the burden of proving entitlement to the offense-level

16

reduction, but the government's rebuttal evidence on this point was not reliable. *See United States v. Espinosa*, 172 F.3d 795, 797 (11th Cir. 1999) ("The district court erred in deferring to the [g]overnment; the responsibility for determining the truthfulness of the information the defendant provided to the [g]overnment was the court's.").

Notwithstanding the agent's unreliable testimony, Mancilla-Ibarra failed to carry his burden of proving that he was truthful about the number of drug deliveries he made to Fann. And it is blackletter law that where the trier of fact remains uncertain, the party with the burden of proof loses. *See Schaffer ex rel. Schaffer v. Weast*, 546 U.S. 49, 56 (2005) (explaining that the term "burden of persuasion" means that the party with the burden "loses if the evidence is closely balanced"); *Beeman v. United States*, 871 F.3d 1215, 1225 (11th Cir. 2017) ("Where, as here, the evidence does not clearly explain what happened[,] the party with the burden loses." (citation and internal quotation marks omitted)); *Dynamic Drinkware, LLC v. Nat'l Graphics, Inc.*, 800 F.3d 1375, 1378–79 (Fed. Cir. 2015) ("Failure to prove the matter as required by the applicable standard means that the party with the burden of persuasion loses on that point—thus, if the fact trier of the issue is left uncertain, the party with the burden loses." (citation and internal quotation marks omitted)); *Lovell ex rel. Lovell v. Poway Unified Sch. Dist.*, 90 F.3d 367, 373 (9th Cir. 1996) ("In general, if the evidence is evenly balanced, such

17

that a decision on the point cannot be made one way or the other, then the party with the burden of persuasion loses."); *Cuppett v. Duckworth*, 8 F.3d 1132, 1140 n.5 (7th Cir. 1993) (en banc) ("A party with the burden of persuasion loses if he fails to meet that burden."); 21B Charles Alan Wright & Kenneth W. Graham, Jr., *Federal Practice and Procedure* § 5122 (2d ed. 2019) ("[A]ll the jury needs to be told is that if it cannot decide who should win, the party with the burden of persuasion loses.").

Based on this record, we cannot say that the district court erred. The record reflects that Fann said that Mancilla-Ibarra made more than two trips and that Mancilla-Ibarra delivered methamphetamine every four or five days with no delivery being for more than one kilogram; approximately three kilograms of methamphetamine were recovered from Fann's home on May 15; and the Drug Enforcement Administration had tagged the white van Mancilla-Ibarra drove as a transport vehicle. The recovery of three kilograms of methamphetamine from Fann's home on May 15 in combination with Fann's statement that Mancilla-Ibarra delivered only one kilogram per trip undermines Mancilla-Ibarra's assertion that he made only two trips. We affirm the denial of the two-level reduction on this basis.

## IV. CONCLUSION

We **AFFIRM** Mancilla-Ibarra's conviction and sentence.