UNPUBLISHED

COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Humphreys and Friedman
Argued at Lexington, Virginia

EARL LANKFORD TORRENCE

v.       Record No. 1183-21-3

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
CHIEF JUDGE MARLA GRAFF DECKER
AUGUST 16, 2022

FROM THE CIRCUIT COURT OF PITTSYLVANIA COUNTY
Stacey W. Moreau, Judge

Joseph A. Sanzone (Sanzone & Baker, L.L.P., on brief), for
appellant.

John Beamer, Assistant Attorney General (Jason S. Miyares,
Attorney General; Liam A. Curry, Assistant Attorney General, on
brief), for appellee.


Earl Lankford Torrence appeals his convictions for possession of methamphetamine and

marijuana with intent to distribute, possession of a firearm after conviction of a felony, and

possession of a firearm while in possession of drugs, in violation of Code

§§ 18.2-248, -248.1, -308.2, and -308.4. He contends that the trial court erred by concluding that

the search of his vehicle was reasonable under the Fourth Amendment to the United States

Constitution. We hold that the trial court's ruling was not error. Consequently, we affirm the

appellant's convictions.

---

[*] Pursuant to Code § 17.1-413, this opinion is not designated for publication.

## I. BACKGROUND[1]

Prior to trial for the instant offenses, the appellant made a motion to suppress the drugs and firearms found in a search of his truck. The evidence at the suppression hearing indicated that the police arrested Justin Leftwich for distributing narcotics. Leftwich then helped set up a "sting" operation that resulted in the appellant's arrest. The details of this operation were described at the hearing.[2]

On August 25, 2020, Investigator Justin Nelson of the Pittsylvania County Sheriff's Office took Leftwich into custody on some outstanding indictments. Investigator Nelson was "very familiar" with Leftwich from "past dealings" in several other criminal cases in the area. The investigator knew that Leftwich was "very well versed in the sale of narcotics" and had a criminal history that primarily involved "large quantities of meth[amphetamine]."

Investigator Nelson set up a meeting between Leftwich and Investigator Derrick Lancaster of the Danville Police Department.[3] Investigator Lancaster specialized in narcotics and firearms and was a task force officer with the Bureau of Alcohol, Tobacco, and Firearms. Also at the meeting was Investigator Nick Samuels of the Pittsylvania County Sheriff's Office.

Investigator Lancaster asked Leftwich about "substantial narcotics" or "firearm distributors that he . . . purchased from." Leftwich, who wanted to "work[]" for leniency on his outstanding charges, provided information about a man he knew as Earl "from Lynchburg." Leftwich said that he had purchased five to six ounces of methamphetamine from the man each

---

[1] An appellate court considers the evidence in the light most favorable to the party who prevailed below, in this case the Commonwealth, and affords it the benefit of all inferences fairly deducible from that evidence. *Mason v. Commonwealth*, 291 Va. 362, 367 (2016).

[2] The court adopted the evidence from the suppression hearing at trial.

[3] The meeting was recorded and played for the trial court at the suppression hearing, and the recording was admitted into evidence.

week between March and August of 2020.  He also reported that he had bought a handgun of a particular model and caliber from Earl.  Investigator Lancaster showed Leftwich a photograph of the appellant—Earl Torrence—and Leftwich identified the photo as depicting the man named Earl who had supplied him with methamphetamine and a handgun.  Leftwich told the investigators that he could "set [the appellant] up without any problem."

During that same interview, Leftwich named two other "substantial" distributors of narcotics and firearms with whom he had worked in the past.  Investigator Lancaster knew Leftwich's information was true regarding one of the men, and Investigator Nelson knew it was true regarding the other one.  Both officers consequently viewed Leftwich's identification of other distributors as further enhancing his reliability.  Leftwich also demonstrated a familiarity with certain measurements used in narcotics trafficking.

After talking with the investigators that afternoon, Leftwich set out to arrange a buy.  He exchanged a series of text messages and phone calls with the appellant in which Leftwich arranged to buy methamphetamine and a handgun from him.  Investigators Lancaster, Nelson, and Samuels were all present during the phone calls and texts used to arrange the transaction.[4]

First, in a text sent shortly before 4:00 p.m., Leftwich asked if he could get one or two ounces of an unnamed substance from the appellant and split the profit with him.  He also inquired about buying a firearm.  The appellant replied that he could meet Leftwich at about 8:00 p.m., after he got off work.  He named the Dairy Queen in Gretna as the location for the meeting.

---

[4] The Commonwealth introduced recordings of the conversations themselves into evidence, as well as photographs showing Leftwich's call history to the appellant and the text messages the two men exchanged.

Next, shortly after 4:00 p.m., Leftwich telephoned the appellant. The appellant told Leftwich that he had "a pile" of methamphetamine in his possession. Leftwich said that, in addition to the drugs, he had a buyer who wanted to purchase a particular handgun.

Later, at about 7:00 p.m., Leftwich telephoned the appellant a second time. The appellant said he was going home to pick up the methamphetamine. Leftwich reminded the appellant to bring the handgun that he had previously mentioned, and the appellant agreed to do so.

After arrangements for the meeting had been made, Investigators Nelson and Samuels worked together in the "takedown" of the appellant.[5] Sergeant Scott Wyatt of the Pittsylvania County Sheriff's Office and an individual identified as Investigator Owens also participated. All of the officers involved knew that Leftwich, the informant, had arranged to meet at 8:00 p.m. with an individual named Earl to buy methamphetamine and a firearm, and they had all seen a photo of their target, the appellant. Based on the informant's report, the officers also knew that the appellant always drove a white plumbing truck when he met the informant to make a sale.

At the designated time, the officers saw a white truck with "Plumb Care Plumbing" written on it arrive at the designated Dairy Queen. In addition, they observed that the person whose photo they had been shown, the appellant, was driving it.[6] Sergeant Wyatt saw no other white plumbing vehicles in the area at the time, and he testified that the Dairy Queen was the only one in Gretna. Based on the officers' knowledge and observations, they seized and searched the truck.

After hearing the evidence and the arguments of counsel, the trial court held that the search of the truck and seizure of the contraband were reasonable under the Fourth Amendment. It concluded that the officers had exigent circumstances based on the automobile exception to the

---

[5] Investigator Lancaster did not participate in that part of the process.

[6] The truck immediately entered the Dairy Queen's drive-through lane.

- 4 -

warrant requirement.  The court further ruled that the police had probable cause for the search.

This probable cause was based in part on the informant's history as a drug dealer.  More

importantly, the investigators had extensive corroboration.  That corroboration came from the

recorded phone calls Leftwich made and the related text messages he sent while in police

custody, in which he set up a deal to buy drugs and a firearm from his regular supplier.

Consequently, the court denied the appellant's motion to suppress the evidence.

The appellant subsequently entered pleas of not guilty.  The court heard additional

evidence regarding the controlled substances and guns seized during the stop, and it convicted

the appellant of the charged offenses.  He was sentenced to a total of fifty years with

twenty-three years suspended for the four different offenses.

## II.  ANALYSIS

The appellant challenges the trial court's denial of his motion to suppress evidence based

on the warrantless search of the vehicle he was driving.

When challenging the denial of a motion to suppress evidence, the appellant bears the

burden of establishing that reversible error occurred.  *Mason v. Commonwealth*, 291 Va. 362,

367 (2016).  In reviewing the record, the appellate court "give[s] deference to the factual

findings of the circuit court" but "independently determine[s] whether the manner in which the

evidence was obtained meets the requirements of the Fourth Amendment."  *Cole v.

Commonwealth*, 294 Va. 342, 354 (2017) (quoting *Cost v. Commonwealth*, 275 Va. 246, 250

(2008)).  Accordingly, the reviewing court defers to any explicit factual findings and views the

remaining evidence "in the light most favorable to the Commonwealth," which includes "giving

it the benefit of any reasonable inferences" from that evidence.  *See Hill v. Commonwealth*, 297

Va. 804, 808 (2019) (quoting *Commonwealth v. White*, 293 Va. 411, 413 (2017)).  The

overarching question of whether the facts establish a Fourth Amendment violation is reviewed *de*

*novo*. *See Ornelas v. United States*, 517 U.S. 690, 699 (1996); *Curley v. Commonwealth*, 295 Va. 616, 621 (2018).

The Fourth Amendment generally requires that a search "be conducted pursuant to a warrant issued by an independent judicial officer," but various exceptions to the warrant requirement exist. *California v. Carney*, 471 U.S. 386, 390 (1985). In some instances, exigent circumstances permit officers, if they have adequate facts to establish probable cause, to conduct a search without first obtaining a warrant. *See Ross v. Commonwealth*, 61 Va. App. 752, 759-60 (2013). One long-recognized exigent circumstance is the "automobile exception." *See Collins v. Virginia*, 138 S. Ct. 1663, 1669 (2018) (citing *Carroll v. United States*, 267 U.S. 132 (1925)), *rev'g* 292 Va. 486 (2016) (*Collins I*), *aff'd on other grounds on remand*, 297 Va. 207 (2019) (*Collins II*). This exception provides that due to the "pervasive regulation of vehicles capable of traveling on the public highways" and their "ready mobility," officers may lawfully search a motor vehicle without a warrant as long as they have probable cause. *Id.* at 1669-70 (quoting *Carney*, 471 U.S. at 390, 392); *see Fore v. Commonwealth*, 220 Va. 1007, 1010-11 (1980).

Here, the police searched the appellant's truck without a warrant. The trial court found that the search was lawful because the automobile exception provided the necessary exigent circumstances and the search was supported by probable cause. The appellant argues that the police had neither exigent circumstances nor probable cause and therefore were not permitted to conduct the warrantless search.

A. Exigent Circumstances

The appellant argues that the automobile exception does not apply because the officers had the opportunity to obtain a warrant after they stopped the truck.[7] He suggests that his vehicle was not mobile at that point because it was "surrounded by police." According to the appellant, these circumstances rendered the automobile exception inapplicable.

Contrary to the appellant's argument, the automobile exception to the warrant requirement does not require additional inquiry into what law enforcement *could* have done. The exception permits a police officer, "*before* making an arrest and *without* obtaining a search warrant, [to] search a vehicle involved in a traffic stop so long as the officer has probable cause to do so." *Curley*, 295 Va. at 621 (emphases added) (citing *Maryland v. Dyson*, 527 U.S. 465, 466-67 (1999) (per curiam); *United States v. Ross*, 456 U.S. 798, 804-09 (1982); and *Carroll*, 267 U.S. at 153). Simply put, when a vehicle is in a public place and the police have probable cause to search it, "the 'automobile exception' has no separate exigency requirement." *Dyson*, 527 U.S. at 466; *see Collins*, 138 S. Ct. at 1668, 1675 (holding that the exception does not allow a police officer "to enter *the curtilage of a home* . . . to search a vehicle" (emphasis added)). Instead, the exception hinges on the principle that the inherent capacity of a vehicle to be quickly moved "creates circumstances of such exigency that, *as a practical necessity*, rigorous enforcement of the warrant requirement is impossible." *Carney*, 471 U.S. at 391 (emphasis added) (quoting *South Dakota v. Opperman*, 428 U.S. 364, 367 (1976)).

---

[7] The appellant also claims that the police should have obtained an anticipatory warrant before going to the Dairy Queen and that they manufactured their own exigent circumstances by failing to do so. We conclude *infra* that a straightforward application of the automobile exception permitted the police to search without a warrant or a showing of exigent circumstances beyond the ready operability of the vehicle. Consequently, we do not separately address these claims about an anticipatory warrant and manufactured exigency.

Therefore, "[i]f a [vehicle] is readily mobile and probable cause exists to believe it contains contraband, the Fourth Amendment . . . permits police to search the vehicle without more." *Pennsylvania v. Labron*, 518 U.S. 938, 940 (1996) (per curiam), *quoted with approval in Dyson*, 527 U.S. at 467. Ready mobility depends solely upon whether the automobile itself is operational or reasonably appears to be, *not* on whether law enforcement are capable of temporarily disabling it such as by physically blocking it in, detaining the driver, or taking his keys. *See United States v. Brookins*, 345 F.3d 231, 237-38 (4th Cir. 2003) (rejecting the district court's ruling that the vehicle was not readily mobile because police could have "blocked" it in), *abrogated in part on other grounds by Collins*, 138 S. Ct. at 1670-71, *as recognized in Collins II*, 297 Va. at 225-26; *see also United States v. Navas*, 597 F.3d 492, 498 (2d Cir. 2010) (recognizing that "a vehicle's *inherent* mobility—not the probability that it might actually be set in motion—is the foundation of the mobility rationale" (emphasis added)), *cited with approval in Collins I*, 292 Va. at 500, *rev'd on other grounds*, 138 S. Ct. at 1675. The fact that the police might feasibly have frozen the scene using such a method in order to secure a warrant is simply not dispositive of whether the search was reasonable under the Fourth Amendment.[8] Consequently, subject to our analysis of the probable cause component, the automobile exception

_____

[8] The appellant asserted repeatedly at oral argument that the exception did not apply because his vehicle was in the Dairy Queen drive-through lane at the time of the stop and consequently was immobile. Assuming without deciding that he adequately preserved this argument for appeal in the trial court, *see Abdo v. Commonwealth*, 64 Va. App. 468, 473 n.1 (2015), it is unavailing for the reasons discussed, *see Fore*, 220 Va. at 1010-11; *Brookins*, 345 F.3d at 237-38; *Navas*, 597 F.3d at 498.

fully supports the trial court's determination that the officers were not required to obtain a warrant before searching the appellant's plumbing truck.[9]

## B. Probable Cause

The appellant asserts that the officers lacked probable cause to conduct the search of his vehicle. He emphasizes that Leftwich had not previously provided information "that led to arrest and conviction."

Probable cause is a "flexible, common-sense standard." *Byrd v. Commonwealth*, 57 Va. App. 589, 597 (2011) (*en banc*) (quoting *Illinois v. Gates*, 462 U.S. 213, 239 (1983)). "At the heart of all the definitions of probable cause is a reasonable ground for belief of guilt 'particularized with respect to the person [or thing] to be [searched].'" *Doscoli v. Commonwealth*, 66 Va. App. 419, 427 (2016) (quoting *Maryland v. Pringle*, 540 U.S. 366, 371 (2003)). It "does not demand any showing" that a law enforcement officer's belief regarding criminal activity "be correct or [even] more likely true than false." *Texas v. Brown*, 460 U.S. 730, 742 (1983) (plurality opinion), *quoted in Curley*, 295 Va. at 622; *see United States v. Ortiz*, 669 F.3d 439, 446 (4th Cir. 2012) (noting that probable cause is "less demanding" than the "preponderance of the evidence" standard). "[A] probability or substantial chance of criminal

---

[9] The appellant relies on *Knowles v. Iowa*, 525 U.S. 113 (1998), and *Lovelace v. Commonwealth*, 258 Va. 588 (1999), which prohibit the search of a vehicle incident to the mere *issuance of a citation* to the driver. The United States Supreme Court, however, subsequently reaffirmed the availability of the automobile exception to the warrant requirement in *Dyson*, 527 U.S. at 466-67.

The appellant also relies on *Arizona v. Gant*, 556 U.S. 332 (2009), a case that addresses the *scope* of a search of an automobile permitted incident to *arrest* of the driver. The ruling in *Gant*, however, expressly leaves intact the ability of officers to search a vehicle, independent of the arrest of a driver or passenger, pursuant to the automobile exception. *See* 556 U.S. at 347 ("If there is probable cause to believe a vehicle contains evidence of criminal activity, [the decision in *Ross*, 456 U.S. at 820-21,] authorizes a search of any area of the vehicle in which the evidence might be found.").

activity," viewed in light of the totality of the circumstances, will suffice. *Gates*, 462 U.S. at 238, 243 n.13, *quoted in Byrd*, 57 Va. App. at 605.

The appellant's challenge relating to probable cause primarily involves Leftwich, the informant. The informant's role in this case is critical to our analysis, and the law in this area is well settled. When the factual basis for probable cause is provided by an informant, that person's "veracity," "reliability," and "basis of knowledge" are all "'highly relevant' factors" in the analysis. *Russell v. Commonwealth*, 33 Va. App. 604, 610 (2000) (quoting *Gates*, 462 U.S. at 230). Under this totality-of-the-circumstances test, a deficiency in veracity or basis of knowledge "may be compensated for, in determining the overall reliability of a tip, by a strong showing as to the other." *Id.* at 611 (quoting *Gates*, 462 U.S. at 233).

It is widely recognized that informants often are criminals themselves. *See* 2 Wayne R. La Fave, *Search and Seizure* § 3.3, at 128 (6th ed. 2020). Nonetheless, a criminal "informant's interest in obtaining leniency create[s] a strong motive to supply accurate information." *United States v. Miller*, 925 F.2d 695, 699 (4th Cir. 1991); *see also Polston v. Commonwealth*, 24 Va. App. 738, 745 (1997) (addressing statements against penal interest and other factors lending credence to the tips of criminal informers), *aff'd on other grounds*, 255 Va. 500 (1998). And "even if [there is] some doubt as to [the] informant's motives, his explicit and detailed description of alleged wrongdoing, along with a statement that the event was observed first-hand, entitles his tip to greater weight than might otherwise be the case." *Russell*, 33 Va. App. at 611 (quoting *Gates*, 462 U.S. at 234); *see Jones v. Commonwealth*, 277 Va. 171, 179 (2009) ("The opportunity to observe and the certainty expressed by the supplier of information in reporting facts to the police bear on the showing of reliability needed to support probable cause.").

Therefore, although "the information supplier's history of reliability is relevant," a lack of such a history is not fatal if the circumstances, viewed in their totality, provide probable cause.

*See Jones*, 277 Va. at 179.  "Police corroboration" of information "has been 'consistently recognized' as a form of such additional or alternative indicia of informant reliability."  *Byrd*, 57 Va. App. at 597 (quoting *Gates*, 462 U.S. at 241).  In short, "[i]nformants' tips . . . come in many shapes and sizes," and the totality-of-the-circumstances test "permits a balanced assessment of the relative weights of *all* the various indicia of reliability . . . attending an informant's [information]."  *Gates*, 462 U.S. at 232, 234 (emphasis added).

Here, the fact that Leftwich had not previously provided information leading to arrest and conviction was not fatal to the Commonwealth's case because the police had a host of other evidence regarding his veracity and reliability, as well as extensive information regarding the basis of his knowledge.  The totality of the circumstances include corroboration in the form of real-time telephone calls and text messages between the informant and the appellant setting up the illegal transactions, contacts that were personally witnessed by law enforcement.  These circumstances provided more than enough support for the trial court's ruling that the police had probable cause to believe that the appellant's truck contained methamphetamine and a handgun at the time of the search.

First, as found by the trial court, Investigator Nelson was "very familiar" with the fact that Leftwich himself had a history of drug offenses, and those offenses established his general base of knowledge regarding the illegal drug culture in the area.  Further, upon Leftwich's arrest on the date at issue, he engaged in a session of recorded questioning in which he demonstrated knowledge of measurements related to the illegal drug trade.  Additionally, when asked about "substantial" narcotics or firearm "distributors that he . . . purchased from," he named a person in each category, and each of those people was known to one of the investigators as engaging in the illegal activity that Leftwich had described.  The investigators viewed this information as helping to establish Leftwich's veracity and reliability.

- 11 -

Second, Leftwich named Earl "from Lynchburg" as a person from whom he had bought drugs and a firearm in the past, and he identified a photo of the appellant as that person. In a statement against his penal interest, Leftwich explained that he had purchased about five ounces of methamphetamine from the appellant weekly for the previous five months, demonstrating the basis for his assertion that the appellant was a "substantial" distributor of illegal drugs. Leftwich also detailed his prior purchase of a particular firearm from the appellant.

Third, while already in police custody and therefore at a time when his ability to fabricate evidence was limited, Leftwich said he could set up a drug transaction with the appellant. He then engaged in a series of telephone conversations and text message exchanges with the person in his telephone contacts list named "Earl[] Lynch." Those communications culminated in the appellant's arrival at the location designated for the purchase at the agreed-upon time. Leftwich made all arrangements in the presence of Investigators Lancaster, Nelson, and Samuels, and he allowed them to record the calls and photograph the text messages. The specific details of these arrangements were provided to the trial court through testimony and physical evidence.

In a text just before 4:00 p.m. and a phone call a few minutes later, Leftwich asked the appellant if he could get one or two ounces of methamphetamine and split the profit with him. The appellant replied with cash prices. Leftwich asked the appellant to meet him at "the store" in Gretna, which he referred to as their "usual spot." The appellant replied that he could meet Leftwich at "*[t]hat* Dairy Queen" on Interstate 40 after he got off work, lending credence to Leftwich's report that he had purchased contraband from the appellant at the same designated location in the past. (Emphasis added). The appellant said during the phone call that he had "a pile" in his possession, which Leftwich told the investigators meant five to ten ounces of methamphetamine. Leftwich also asked the appellant about buying a firearm.

- 12 -

In a later phone call at about 7:00 p.m., the appellant reported that he was going home to pick up the methamphetamine and handgun that Leftwich had requested. Shortly before 8:00 p.m., the appellant texted Leftwich to be sure he was "going to be there" at 8:00 p.m. as agreed. Then, at 8:00 p.m., just as Leftwich had said and just as the appellant himself had indicated in his text messages, the appellant arrived at the designated location driving the specific type of vehicle that Leftwich had described, a white plumbing truck. *See State v. Journet*, 191 A.3d 1181, 1185-86 (Me. 2018) (holding that despite what the "motion court[]" described as the "tipster's anemic resume as an informant," significant evidence corroborated his claims about an impending drug sale, including text messages "indicating that the heroin delivery was 'good to go' as described"); *United States v. Mancilla-Ibarra*, 947 F.3d 1343, 1349-50 (11th Cir. 2020) (holding that an arrestee's report that a white van with Georgia tags, previously caught on video, delivered his drugs, coupled with a text message to his alleged supplier seeking another delivery, provided probable cause to arrest the driver when the van reappeared "on schedule").

Consequently, despite the fact that Leftwich had not previously provided law enforcement with information that had led to arrest or conviction, the information that he provided on August 25, 2020, was well corroborated and established his veracity, reliability, and basis of knowledge. That corroboration included telephone calls, text messages, and the arrival of the appellant (the person whom the informant had identified in a photo) at the designated location at the agreed-upon time in the anticipated vehicle. *See Journet*, 191 A.2d at 1185-86; *Mancilla-Ibarra*, 947 F.3d at 1349-50. These circumstances, viewed in their totality, were sufficient to provide the officers with probable cause to believe that the appellant's truck contained illegal drugs and a firearm. *See Jones*, 277 Va. at 178 (citing *United States v. Grubbs*, 547 U.S. 90, 95 (2006)). That probable cause, combined with the ready mobility of the truck,

- 13 -

permitted the officers to conduct a warrantless search of the vehicle under the automobile exception. *See Curley*, 295 Va. at 621 (citing *Dyson*, 527 U.S. at 466-67).

## III. CONCLUSION

We hold that the trial court did not err by ruling that the officers had both exigent circumstances and probable cause to search the appellant's truck without a warrant. The trial court properly denied his motion to suppress on those grounds. As a result, we affirm the appellant's convictions.

*Affirmed.*